### NICOLE HURLEY ET AL. *v.* THE HEART PHYSICIANS, P.C., ET AL. (SC 18423)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued May 25—officially released September 14, 2010

*Carey B. Reilly,* with whom was *James D. Horwitz,* for the appellants (named plaintiff et al.).

*Lori G. Cohen,* pro hac vice, with whom were *James H. Rotondo* and, on the brief, *Michael P. Shea,* for the appellee (defendant Medtronic, Inc.).

VERTEFEUILLE, J. This appeal arises out of proceedings following our remand to the trial court in *Hurley* v. *Heart Physicians, P.C.*, 278 Conn. 305, 898 A.2d 777 (2006). In *Hurley*, we concluded that the trial court improperly had granted the defendant's motion for summary judgment as to the plaintiffs' claim under the Connecticut Product Liability Act, General Statutes § 52-572m et seq., on the basis of the learned intermediary doctrine because of the existence of a disputed issue of material fact, and we remanded the case for a determination of that factual issue.[1] Id., 309, 326. In the present appeal,[2] the named plaintiff, Nicole Hurley (plaintiff),[3] appeals from the judgment of the trial court, following a jury trial, in favor of the defendant Medtronic, Inc. (defendant).[4] On appeal, the plaintiff claims that the trial court improperly: (1) stated the factual issue to be tried on remand following this court's decision in *Hurley*; (2) found that the jury verdict was unanimous; and (3) permitted the defendant to offer evidence

---

[1] We affirmed the trial court's summary judgment as it related to the plaintiffs' claim under the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., determining that it was barred by the exclusivity provision of the Connecticut Product Liability Act.

[2] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

[3] The complaint was brought on Nicole Hurley's behalf by her parents, Lucinda Hurley and Navarro Hurley, who additionally asserted claims in their individual capacities. In October, 2007, the trial court granted the motion to substitute Barbara Miller as conservator of Nicole Hurley's estate. All parties continue to refer to Nicole Hurley as the plaintiff. For convenience, our use of the term "plaintiff" refers only to Nicole Hurley because Lucinda Hurley's claims are not relevant to this appeal and Navarro Hurley withdrew as a party in January, 2008.

[4] In addition to Medtronic, Inc., the complaint initially named as defendants Richard Landesman, the plaintiff's cardiologist, and The Heart Physicians, P.C., the facility at which Landesman provided services to the plaintiff. The plaintiff ultimately withdrew her claims against those defendants. Medtronic, Inc., is the only remaining defendant.

of the negligence of the plaintiff's treating physicians on the issue of causation. We affirm the judgment of the trial court.[5]

The underlying facts are set forth fully in our previous opinion; see id., 309–14; which we reiterate to the extent the facts are relevant to the issues raised in this appeal. "[The plaintiff] was born with a congenital complete heart block condition that interfered with her heart's capacity to produce a safe heart rhythm. When she was seven days old, her physicians implanted a cardiac pacemaker manufactured by the defendant. Every few years, [the plaintiff] received a new pacemaker manufactured by the defendant, allowing her to grow and live a normal life.

"On September 14, 1998, when [the plaintiff] was fourteen years old, her pacemaker's elective replacement indicator signaled that the pacemaker battery was nearing the end of its life cycle and was wearing down. [The plaintiff's] cardiologist, Richard Landesman, asked Frank Kling, a representative of the defendant, to attend an examination of [the plaintiff] and to test the battery in her pacemaker. Kling often was called in by physicians to evaluate pacemakers, looking at the mode, rate, amplitude, pulse width and sensitivity of the device, and to make adjustments at the direction of the physicians. The intent of Kling's visit to Landesman's office, however, was for Kling to assess whether the plaintiff's pacemaker was at its end of life.

"During the visit, based on information he had gathered from Kling, Landesman concluded that [the plaintiff] needed a new pacemaker. Because, however, according to Landesman, Lucinda Hurley had refused to have the pacemaker replaced, Landesman decided

---

[5] Because we affirm the judgment of the trial court, we need not reach the defendant's alternate ground for affirmance that the plaintiff failed to prove causation.

to adjust downward the rate of the pacemaker in an effort to evaluate [the plaintiff's] ability to function with the pacemaker operating at a lower rate. Landesman testified that, because [the plaintiff's] 'heartbeat had been previously demonstrated in Yale-New Haven [Hospital] to be in the [fifty to sixty paces per minute] range without the pacemaker . . . [he] was actually trying to obtain some additional information which [he] hoped would eventually convince [the plaintiff's] mother that she needed to have the battery replaced.' Landesman further explained that he hoped that by adjusting the rate, he could gather information about new symptoms that [the plaintiff] might experience in a further effort to convince her mother of the need for a replacement. Finally, Landesman was interested in obtaining information about a different type of pacemaker, one with two wires that [the plaintiff's] physicians at Yale-New Haven Hospital had suggested.

"In his deposition, Kling confirmed that his 'interrogation' or evaluation of [the plaintiff's] pacemaker indicated that the battery was low and that, although it 'was still very much operating,' he had relayed to Landesman that the pacemaker battery needed to be replaced as soon as possible. Kling testified, however, that Lucinda Hurley had been adamant about wanting her daughter's pacemaker removed altogether. In exploring the possible responses to the situation, Kling stated that his role was to present options and that, in 'trying to understand and assess' [the plaintiff's] condition, he had presented to Landesman the option of lowering the rate. Kling explained that, '[b]y taking the rate from [sixty to forty paces per minute], just like you take amplitude from eight volts to four volts, you are also giving yourself more time before a device would, you know, hit that end point. So you know, in this whole realm of consideration, it's giving us more time to work this situation and maybe [Lucinda] Hurley would come around and

wake up and say jeez, I've got to get this done. Leaving it at [sixty] would keep it on its present course' but lowering the rate from sixty paces per minute would 'buy us more time, just as it would changing the other three parameters.' According to Kling's testimony, '[t]he only other option which was there from the beginning to the end was that this pacemaker needs to be replaced. And that was impressed over and over and over again.' In light of what he understood Lucinda Hurley's position to be on the matter, Kling adjusted the pacemaker down from sixty paces per minute to forty." Id., 309–11. The plaintiff again saw Landesman on October 19, 1998, at which time the pacemaker's battery was again tested but the rate was not raised and it continued to operate at the reduced pace. On October 26, 1998, the plaintiff went into cardiac arrest while at school, and suffered permanent brain damage as a result.

The plaintiff commenced the action underlying this appeal in March, 2000, against Landesman and The Heart Physicians, P.C., his employer, and the defendant was added as a party in September, 2001. See footnote 4 of this opinion. The plaintiff's complaint asserted claims of malpractice as to Landesman and The Heart Physicans, P.C., and recklessness, product liability, and a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., as to the defendant. In August, 2004, the defendant filed a motion for summary judgment, which was granted by the trial court, Rogers, J. The plaintiff filed an appeal shortly thereafter, and we transferred the appeal from the Appellate Court to this court. In Hurley, we concluded that the trial court properly had rendered summary judgment for the defendant on the plaintiff's CUTPA claim, but we reversed the judgment with respect to the plaintiff's product liability claim, finding that an issue of material fact existed as to whether Kling's words and actions were in derogation of the

pacemaker's technical manual. *Hurley* v. *Heart Physicians, P.C.*, supra, 278 Conn. 308–309.

After our remand, a jury trial began in November, 2007, and, after approximately twenty-six days of testimony, the jury returned a verdict in favor of the defendant. The trial court rendered judgment in accordance with the verdict, and this appeal followed. Additional facts will be set forth as necessary.

## I

The plaintiff first claims that the trial court improperly failed to follow this court's remand order from *Hurley*. Specifically, the plaintiff claims that the trial court improperly required her to prove that Kling's advice and conduct "actually contradicted," and therefore "vitiated" and "nullified" the warnings in the manual. She contends that she should have been required to prove only that Kling's actions were "inconsistent" with the manual, which she contends is a less onerous requirement than the one applied by the court.[6] The

---

[6] The plaintiff additionally contends that the trial court, by determining that the sole triable issue was whether Kling "by his oral communications . . . accompanied by his physical adjustment" of the pacemaker, inappropriately precluded her from presenting her separate and unique claim that Kling's conduct alone, notwithstanding his advice, rendered the pacemaker ineffective. The plaintiff did not adequately brief this issue in her initial brief filed in this court, only raising a vague assertion of her claim. The defendant, therefore, could not respond in any meaningful way. The plaintiff amplified her discussion of the issue considerably in her reply brief. We will not address the issue, however, because we consider an argument inadequately briefed when it is delineated only in the reply brief. "[W]e generally decline to consider issues that are inadequately briefed; see, e.g., *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 87, 942 A.2d 345 (2008) (We are not obligated to consider issues that are not adequately briefed. . . . Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice. . . .); or that are raised for the first time in a reply brief; see, e.g., *SS-II, LLC* v. *Bridge Street Associates*, 293 Conn. 287, 302, 977 A.2d 189 (2009) ([i]t is well established . . . that [c]laims . . . are unreviewable when raised for the first time in a reply brief . . .) . . . ."

defendant responds that the trial court properly interpreted this court's remand from *Hurley*. The defendant specifically asserts that the trial court properly stated both the scope of the issues and the burden of proof for the subsequent trial pursuant to the remand, and did not improperly limit the plaintiff's ability to present her case.[7] We agree with the defendant.

The following additional undisputed facts are relevant to this discussion. In *Hurley*, the plaintiff appealed from the trial court's summary judgment rendered in favor of the defendant on the plaintiff's failure to warn product liability claims based on the learned intermediary doctrine. *Hurley* v. *Heart Physicians, P.C.*, supra,

---

(Internal quotation marks omitted.) *Hasychak* v. *Zoning Board of Appeals*, 296 Conn. 434, 437 n.4, 994 A.2d 1270 (2010); see also *Commissioner of Health Services* v. *Youth Challenge of Greater Hartford, Inc.*, 219 Conn. 657, 659 n.2, 594 A.2d 958 (1991) ("We decline to consider these claims because they either were never raised or *were so inadequately briefed in the defendant's original brief that we consider them abandoned. Claims of error by an appellant must be raised in his original brief . . . so that the issue as framed by him can be fully responded to by the appellee in its brief,* and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error." [Citation omitted; emphasis added; internal quotation marks omitted.]).

We additionally note that contrary to this claim, at trial, counsel for the plaintiff argued in response to the defendant's motion for a directed verdict that "the issue as defined by the Supreme Court related both to the words of [Kling] and the conduct of [Kling]. And the question that the Supreme Court has directed us to try in this case is whether the *words accompanied by the conduct* of [Kling] were consistent with or inconsistent with the technical manual." (Emphasis added.)

[7] The defendant additionally contends that the plaintiff failed to raise her claim in the trial court on remand, thereby failing to present an adequate record. See Practice Book § 61-10; *Konigsberg* v. *Board of Aldermen*, 283 Conn. 553, 597 n.24, 930 A.2d 1 (2007) ("[a]s we have observed repeatedly, [t]o review [a] claim, which has been articulated for the first time on appeal and not before the trial court, would result in a trial by ambuscade of the trial judge" [internal quotation marks omitted]). After a careful review of the record, we determine, however, that the issue was sufficiently preserved in the trial court. See footnote 12 of this opinion.

278 Conn. 307–308. The plaintiff's claim before the trial court was based on the assertion that Kling, as the defendant's representative, had made statements to Landesman, the plaintiff's treating physician, and had engaged in conduct, namely, recommending that the pacemaker's function level be reduced and setting the pacemaker to work at that reduced level, which nullified the warnings regarding battery replacement that were contained in the pacemaker's technical manual. Id., 307. The plaintiff claimed that, because Kling's statements and conduct nullified the pacemaker's adequate published warnings about the risks inherent in setting the pacemaker at a reduced level, the defendant had failed to warn her of the potential risks caused by reducing the pacemaker's function in lieu of replacing the battery. Id. In its subsequent motion for summary judgment, the defendant asserted that the learned intermediary doctrine[8] shielded Kling from liability. Id., 307–308. More specifically, the defendant contended that, as the plaintiff's physician, Landesman was a learned intermediary and stood in the best position to evaluate and to warn the plaintiff of any risks associated with reducing the pacemaker's function and, as a result, it was not Kling's obligation to warn the plaintiff himself. Id., 308. The trial court agreed that the learned intermediary doctrine applied and rendered summary judgment in favor of the defendant. Id., 312–14.

On appeal to this court, we reversed in part the summary judgment rendered in favor of the defendant. Id., 323–24. Specifically, we "conclude[d] that the record

---

[8] The learned intermediary doctrine is "based on the principle that prescribing physicians act as learned intermediaries between a manufacturer and the consumer and, therefore, stand in the best position to evaluate a patient's needs and assess the risks and benefits of a particular course of treatment . . . [and as a result] adequate warnings to prescribing physicians obviate the need for manufacturers . . . to warn ultimate consumers directly." (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.*, supra, 278 Conn. 308.

reflects a material question of fact as to whether the warnings given by [Kling] were consistent with the manual and, therefore, the trial court improperly determined that the defendant was entitled to prevail under the learned intermediary doctrine as a matter of law." Id., 308–309. In so concluding, we reasoned that "[t]he dispositive issue in [*Hurley*] is whether the trial court properly determined *as a matter of law* that Kling's oral advice and his rate reduction to the pacemaker were for *diagnostic* purposes, [and thus] were consistent with the technical manual and, therefore, did not nullify the warnings in the manual. . . . The plaintiffs admit that the pacemaker was accompanied by adequate warnings *in the manual*. What is at issue, however, is whether, notwithstanding the [Food and Drug Administration (FDA)] approved written pacemaker replacement warnings, Kling, by his *oral* communications to Landesman that turning down the pacemaker was an option, accompanied by his *physical* adjustment of the pacemaker to forty paces per minute, actually contradicted the manual, thereby vitiating and nullifying the manual's warnings, and rendered the pacemaker essentially ineffective." (Emphasis in original.) Id., 321–22. Because the determination of "[w]hether Kling behaved in a manner consistent with the technical manual is a question of fact," we remanded the case to the trial court. Id., 322. Our concluding mandate[9] to the trial court stated that "[t]he judgment [of the trial court] is reversed as to the product liability counts and the case is remanded to the trial court for further proceedings according to law." Id., 326.

---

[9] "A mandate is the official notice of action of the appellate court, directed to the court below, advising that court of the action taken by the appellate court, and directing the lower court to have the appellate court's judgment duly recognized, obeyed, and executed." (Internal quotation marks omitted.) *Matey* v. *Estate of Dember*, 85 Conn. App. 198, 204 n.2, 856 A.2d 511 (2004), quoting 5 Am. Jur. 2d 446, Appellate Review § 776 (1995).

On remand, the trial court subsequently interpreted our mandate and framed the threshold issue to be tried by the jury. The trial court stated that "[i]n examining, as I must, the full Supreme Court opinion in [*Hurley*], I find . . . that the issue of [Landesman's] status as a learned intermediary was necessarily determined as a matter of law, and that determination was meant to be the law of the case on remand. Having found a triable issue of fact which mandates a reversal of the summary judgment entered, the Supreme Court did not stop there but chose to make its true meaning and intent on remand unmistakable: 'If there exists an *undisputed* record demonstrating that Kling did *nothing inconsistent* with the manual, then we would agree with the defendant that the trial court properly rendered judgment in its favor on the learned intermediary doctrine.' . . . [*Hurley* v. *Heart Physicians, P.C.*, supra, 278 Conn. 321]." (Emphasis in original.) According to the trial court, whether Kling's actions and statements were in derogation of the manual constituted the "one issue of material fact to be tried on remand . . . ." The trial court, therefore, submitted to the jury interrogatory number one, which asked whether "the [p]laintiff [has] proven by a fair preponderance of the evidence that [Kling], by his oral communications to [Landesman] that turning down the pacemaker was an option, *accompanied by* his physical adjustment of the pacemaker to forty paces per minute, *actually contradicted* the [t]echnical [m]anual thereby *vitiating and nullifying* the manual's warnings . . . ." (Emphasis added.)[10]

---

[10] The trial court instructed the jury in its oral charge that the "[p]laintiff has asserted a claim in product liability that [the plaintiff's] damages and injuries were caused by an alleged failure to warn by [the defendant] due to the statements and conduct of [Kling], a representative of [the defendant]. . . . To prevail in this claim, the plaintiff must prove that, one, the warnings provided in the technical manual were nullified or rendered inadequate due to [Kling's] statements and conduct. And second, that [Kling's] statements and conduct caused [the plaintiff's] injuries.

We begin our analysis with the applicable standard of review. Determining the scope of a remand is a matter of law because it requires the trial court to undertake a legal interpretation of the higher court's mandate in light of that court's analysis. See, e.g., *Higgins* v. *Karp*, 243 Conn. 495, 502–503, 706 A.2d 1 (1998) (duty of trial court to comply with Supreme Court mandate "according to its true intent and meaning" [internal quotation marks omitted]). Because a mandate defines the trial court's authority to proceed with the case on remand, determining the scope of a remand is akin to determining subject matter jurisdiction. See, e.g., *Matey* v. *Estate of Dember*, 85 Conn. App. 198, 207, 856 A.2d 511 (2004) (Appellate Court lacks jurisdiction when Supreme Court's remand order is ignored because no final judgment pursuant to remand). "We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary." (Internal quotation marks omitted.) *State* v. *Sunrise Herbal Remedies, Inc.*, 296 Conn. 556, 567, 2 A.3d 843 (2010).

At the outset, we note that, "[i]f a judgment is set aside on appeal, its effect is destroyed and the parties are in the same condition as before it was rendered." *Bauer* v. *Waste Management of Connecticut, Inc.*, 239 Conn. 515, 523, 686 A.2d 481 (1996). As a result, "[w]ell

* * *

"The issue for you to decide then, based on all the evidence you have heard, is whether or not the plaintiff has proved that, notwithstanding the FDA approved written [elective replacement indicator] or pacemaker replacement warnings in the technical manual, [Kling] by his oral communications to [Landesman] that turning down the pacemaker was an option, accompanied by his physical adjustment of the pacemaker to [forty] paces per minute, actually contradicted the technical manual, thereby vitiating and nullifying the manual's warnings and rendered the pacemaker essentially ineffective. . . . If you find that [Kling's] words to [Landesman] accompanied by his physical adjustment of the pacemaker to [forty] paces per minute were consistent with the provisions of the technical manual, then your verdict must be for the defendant . . . ."

established principles govern further proceedings after a remand by this court. In carrying out a mandate of this court, the trial court is limited to the specific direction of the mandate as interpreted *in light of the opinion*. . . . This is the guiding principle that the trial court must observe. . . . It is the duty of the trial court on remand to comply strictly with the mandate of the appellate court according to its true intent and meaning. . . . The trial court should examine the mandate and *the opinion of the reviewing court and proceed in conformity with the views expressed therein.*" (Emphasis in original; internal quotation marks omitted.) *Higgins* v. *Karp*, supra, 243 Conn. 502–503; see also *Matey* v. *Estate of Dember*, supra, 85 Conn. App. 205 (citing *Higgins*); cf. General Statutes § 52-266 ("[i]f several issues are presented by the pleadings and, on the trial of one or more of such issues, an error or ground for a new trial intervenes which does not affect the legality of the trial or disposition of the other issue or issues, judgment shall not be arrested or reversed, nor a new trial granted, except so far as relates to the particular issue or issues in the trial of which such error or ground for a new trial intervened").

"Compliance [with a mandate] means that the direction is not deviated from. The trial court cannot adjudicate rights and duties not within the scope of the remand. . . . No judgment other than that directed or permitted by the reviewing court may be rendered . . . . The trial court should examine the mandate and the opinion of the reviewing court and proceed in conformity with the views expressed therein." (Internal quotation marks omitted.) *Halpern* v. *Board of Education*, 231 Conn. 308, 311, 649 A.2d 534 (1994). We are mindful, however, that "[w]e have rejected efforts to construe our remand orders so narrowly as to prohibit a trial court from considering matters relevant to the issues upon which further proceedings are ordered that

may not have been envisioned at the time of the remand. . . . So long as these matters are not extraneous to the issues and purposes of the remand, they may be brought into the remand hearing." (Citation omitted; internal quotation marks omitted.) *Higgins* v. *Karp*, supra, 243 Conn. 502–503.

In applying these principles to the present case, we first review our analysis, remand and mandate in *Hurley*. In that case, as we already have noted, we determined that "[t]he dispositive issue in this appeal is whether the trial court properly determined as a matter of law that Kling's oral advice and his rate reduction to the pacemaker were for diagnostic purposes, were consistent with the technical manual, and, therefore, did not nullify the warnings in the manual." *Hurley* v. *Heart Physicians, P.C.*, supra, 278 Conn. 321. We ultimately decided that "we cannot conclude as a matter of law that the defendant established that the adjustment [to the pacemaker] was done for diagnostic purposes." Id., 323. As we explicitly stated, "[w]hat is at issue, however, is whether, notwithstanding the FDA approved written pacemaker replacement warnings, Kling, by his *oral* communications to Landesman that turning down the pacemaker was an option, accompanied by his *physical* adjustment of the pacemaker to forty paces per minute, actually contradicted the manual, thereby vitiating and nullifying the manual's warnings, and rendered the pacemaker essentially ineffective." (Emphasis in original.) Id., 321–22. Because we determined that "[w]hether Kling behaved in a manner consistent with the technical manual is a question of fact"; id., 332; we reversed the summary judgment in part and "remanded [the case] to the trial court for further proceedings according to law." Id., 326. Our remand, when considered in conjunction with our analysis and conclusions regarding the remaining issue of material fact, thus unequivocally required the

trial court to secure a factual finding determining whether Kling's advice and conduct had been for diagnostic purposes and thus in accordance with the technical manual.

On remand, the trial court properly reviewed our mandate within the context of the opinion and proceeded with a jury trial in order to secure a factual finding by the jury as to whether Kling's advice and conduct were in accordance with the pacemaker's manual. The trial court based the relevant jury charge and the interrogatory on the factual issue that we determined could not be resolved as a matter of law. Indeed, the trial court carefully tracked the language we used in *Hurley* to frame its interrogatory to the jury.[11] The relevant interrogatory asked the jury to determine whether "the [p]laintiff [has] proven by a fair preponderance of the evidence that [*Kling*], *by his oral communications to [Landesman] that turning down the pacemaker was an option, accompanied by his physical adjustment of the pacemaker to forty paces per minute, actually contradicted the [t]echnical [m]anual thereby vitiating and nullifying the manual's warnings* . . . ." (Emphasis added.) This language mirrored what we identified in *Hurley* to be the relevant factual issue in our analysis of whether summary judgment was appropriate. See *Hurley* v. *Heart Physicians, P.C.*, supra, 278 Conn. 321–22 ("[w]hat is at issue, however, is whether, notwithstanding the FDA approved written pacemaker replacement warnings, *Kling, by his oral communications to [Landesman] that turning down the pacemaker was an option, accompanied by his physical adjustment of the pacemaker to forty paces*

---

[11] While discussing the jury charge, the trial court noted: "I'm going to go with [certain language] because [the Supreme Court] used it several times [in the opinion] . . . ." The trial court explained its decision to use language from our opinion because "[i]t was my intention to track exactly what the Supreme Court said in virtually every instance."

*per minute, actually contradicted the manual, thereby vitiating and nullifying the manual's warnings,* and rendered the pacemaker essentially ineffective" [emphasis altered]).

Despite the trial court's verbatim recitation of what we determined to be the unresolved issue of material fact, the plaintiff contends that the trial court should have instructed the jury to determine whether Kling's advice had been "inconsistent" with the manual rather than had "actually contradicted" the manual, which she claims imposed a heightened burden of proof on her.[12] The plaintiff cites various instances in *Hurley* wherein we did indeed use the word "inconsistent" or "consistent" instead of "contradict."[13] We disagree with the plaintiff, however, that the trial court imposed a heightened burden of proof because, first, the trial court directly cited what we had determined to be the remaining triable factual issue, and, second, we had used the words "contradict" and "inconsistent" interchangeably, as the words are synonymous. Evidence that two words are synonymous generally is that each is used to define the other. "[C]ontradict" is defined as

[12] Prior to charging the jury on January 18, 2008, the trial court requested that each party submit proposed jury charges and interrogatories. On November 20, 2007, the plaintiff submitted the following instruction: "[D]id [Kling] say *anything inconsistent* with the written labeling? . . . [W]as [Kling's] reduction of the rate of the pacemaker . . . in *any way inconsistent* with the written labeling?" (Emphasis in original.) On January 14, 2008, the plaintiff requested that the following interrogatory be given to the jury: "Do you find that Kling's words and/or conduct were inconsistent with the technical manual?"

[13] In conducting our analysis in *Hurley*, we reasoned that "[i]f there exists an undisputed record demonstrating that Kling did nothing *inconsistent* with the manual, then we would agree with the defendant . . . ." (Emphasis in original.) *Hurley* v. *Heart Physicians, P.C.*, supra, 278 Conn. 321. "Whether Kling behaved in a manner *consistent* with the technical manual is a question of fact . . . . [W]hether the discussion between Kling and Landesman and the adjustment actually made were *consistent* with . . . [the manual in this case] raised disputed factual issues . . . ." (Citation omitted; emphasis added.) Id., 322–23.

"[t]o assert or express the opposite of (a statement) . . . [t]o be contrary to; be *inconsistent* with," while a "contradiction" is defined as an "[*i*]*nconsistency*; discrepancy." (Emphasis added.) American Heritage Dictionary of the English Language (3d Ed. 1992). Similarly, "inconsistent" is defined as "[d]isplaying or marked by a lack of consistency, especially . . . [l]acking in correct logical relation; *contradictory*: inconsistent statements." (Emphasis added.) Id. We therefore conclude that the trial court properly interpreted our remand and, accordingly, properly presented the relevant triable factual issue to the jury in interrogatory number one.

II

The plaintiff next claims that the trial court should not have accepted the jury's verdict because it was not unanimous. Specifically, the plaintiff contends that, during a poll of the jury, one particular juror, F.C.,[14] voiced unequivocal disagreement with the verdict, and, consequently it was improper for the trial court repeatedly to question F.C. whether the jury's verdict was also his verdict, with resulting pressure on F.C. to conform to the jury's verdict. The defendant responds that F.C. merely was confused by either the polling question posed to him or the polling process itself. Specifically, once F.C.'s confusion came to the attention of the trial court, the defendant claims that the trial court properly undertook a neutral inquiry of F.C. to ascertain whether he agreed with the jury's verdict in favor of the defendant, and, in so doing, properly concluded that the verdict was unanimous. We agree with the defendant.

The record reveals the following additional facts and procedural history relevant to this claim. After the con-

---

[14] To protect the privacy of the jurors discussed in this opinion, we shall refer to them only by their initials. See *State* v. *Figueroa*, 257 Conn. 192, 194 n.4, 777 A.2d 587 (2001).

clusion of the evidence in the trial, the trial court submitted the case to the jury, instructing them that "[y]our verdict must be unanimous. There is no such thing as a majority vote of a jury in Connecticut." The trial court also explained the procedure for announcing a verdict, instructing them that "[w]hen the jury is asked if it has reached a verdict, the *foreperson* should respond." (Emphasis added.) After the jury notified the court that it had reached a verdict, the court clerk initiated the proper roll call procedure, and the following exchange took place:

"The Clerk: . . . [H]ave you reached a verdict?

"[The Foreperson]: We have.

"[F.C.]: Do we all answer?

"The Clerk: Just the foreperson.

"The Court: The foreperson can answer."

The clerk then read into the record the written interrogatories and verdict form from the jury. At the conclusion of the reading, the trial court accepted and ordered the verdict recorded. The plaintiff then requested an individual poll of the jurors, which the trial court granted, but postponed until after the clerk read the interrogatories and the verdict form for a second time, pursuant to the established procedure. Following the second reading, the clerk asked: "Ladies and gentlemen of the jury, do you agree that this is your verdict?" The jurors responded unanimously, and without audible disagreement, "[y]es." The clerk then commenced the individual polling. The first two jurors polled, the foreperson and another juror, M.G., responded "[i]t is" and "[y]es," respectively, to the question "this is your verdict?" The following is the entire exchange that occurred when the clerk polled F.C.:[15]

---

[15] The transcript reflects that at various times in the exchange the trial court and F.C. spoke simultaneously, interrupting one another. This court also has reviewed the audio recording of the exchange, which was preserved

"The Clerk: [F.C.], is this your verdict?

"[F.C.]: I . . . what exactly is this for again? I just . . . .

"The Court: Individual polling one by one. The question is, is this your verdict, yes or no?

"The Clerk: [F.C.], is this your verdict?

"[F.C.]: Ummm. No, it's not my verdict. Yeah. You want us to admit it was hard. I don't . . .

"The Court: No, no.

"[F.C.]: I'm trying to figure out—

"The Court: [F.C.], at this point—

"[F.C.]: This is it, this is our final thing, right?

"The Court: This is—the verdict has been—

"[F.C.]: Read off.

"The Court: —announced in court. And this is—

"[F.C.]: Yes.

"The Court: —an individual polling of jurors one by one.

"[F.C.]: Yes.

"The Court: You were asked collectively.

"[F.C.]: Right.

"The Court: And now at a request one by one you're being asked. Ask the question again, please.

"The Clerk: [F.C.], is this your verdict?

---

by the trial court after a request by the plaintiff. For the sake of clarity, this is the trial court's explanation of the polling process without F.C.'s interjections: "[F.C.], at this point . . . [t]his is—the verdict has been . . . announced in court. And this is . . . an individual polling of jurors one by one. . . . You were asked collectively. . . . And now at a request one by one you're being asked."

"[F.C.]: Yes."

After the clerk finished conducting the individual poll, the trial court excused the jury and asked counsel whether any motions or comments remained. Counsel for the plaintiff stated that the verdict should not be accepted because F.C. denied that the verdict was his during the individual poll. Counsel for the defendant disagreed, asserting that, although F.C. initially exhibited some confusion about the poll question and needed some guidance, F.C. was firm and without equivocation in his final assent to the verdict. After a short recess, the trial court instructed the parties that it already had ordered the verdict accepted and now would excuse the jurors. The trial court reasoned: "The jury was asked twice as a group, is this your verdict? I heard no negative answer, no no's when that answer was given. [F.C.] seemed *surprised* when his name was called. I think there was some *confusion* as to why he was being called. He asked, what is this about? . . . It was explained to him by myself what it was. I believe twice, certainly once after it was explained to him he responded, 'yes,' and I think that answer being his final answer and being unqualified has to be taken as his position." (Emphasis added.)

After the trial court excused the jury, counsel for the plaintiff orally moved for a mistrial, claiming lack of jury unanimity. Counsel for the defendant opposed the motion and, pursuant to the trial court's request, both parties filed simultaneous briefs the following week.[16]

---

[16] The plaintiff attached to her memorandum what she claimed were F.C.'s sworn statements in response to questions posed by counsel for the plaintiff during an interview held several days after the verdict was delivered. The plaintiff used these statements to support her claim of lack of jury unanimity. The trial court did not consider these statements in denying the plaintiff's motion for a mistrial, concluding that under Connecticut jurisprudence the statements essentially inhered in the verdict itself and were immaterial evidence that could not be used to impeach a verdict. See *State* v. *Gary*, 273 Conn. 393, 869 A.2d 1236 (2005); *Aillon* v. *State*, 168 Conn. 541, 363 A.2d 49 (1975). The plaintiff has not challenged this decision on appeal, and we therefore also do not consider F.C.'s out-of-court statements.

Following a lengthy oral argument, the trial court issued a written decision denying the motion for a mistrial, finding "that there was no improper coercion worked upon [F.C.] by the dialogue that took place in the courtroom" and F.C.'s "final '[y]es' was his operative answer and affirmation that he joined with the other five jurors in rendering the verdict for the defendant, and the verdict was therefore unanimous."

We begin by setting forth our standard of review. "The principles that govern our review of a trial court's ruling on a motion for a mistrial are well established. Appellate review of a trial court's decision granting or denying a motion for a [mistrial] must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a [mistrial] is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a] mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 415–16, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

"In reviewing a claim of abuse of discretion, we have stated that [d]iscretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors. . . . Therefore, [i]n

those cases in which an abuse of discretion is manifest or where injustice appears to have been done, reversal is required." (Citations omitted; internal quotation marks omitted.) Id., 416.

"While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his [or her] function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the [appellant] and, if so, what remedy is necessary to cure that prejudice." (Internal quotation marks omitted.) State v. Gary, 273 Conn. 393, 413, 869 A.2d 1236 (2005).

We recently had the opportunity to examine the role of jury polling in civil cases pursuant to Practice Book § 16-32[17] in Wiseman v. Armstrong, 295 Conn. 94, 101, 989 A.2d 1027 (2010). In that case, we stated that the purpose of polling is intertwined with a party's right under Practice Book § 16-30[18] to a unanimous verdict

[17] Practice Book § 16-32 provides: "Subject to the provisions of Section 16-17, after a verdict has been returned and before the jury has been discharged, the jury shall be polled at the request of any party or upon the judicial authority's own motion. The poll shall be conducted by the clerk of the court by asking each juror individually whether the verdict announced is such juror's verdict. If upon the poll there is not unanimous concurrence, the jury may be directed to retire for further deliberations or it may be discharged."

[18] Practice Book § 16-30 provides: "The verdict shall be unanimous and shall be announced by the jury in open court."

in civil cases. Id., 103. We reiterated that "[t]he stability of jury verdicts is and has been of concrete substance to our justice system and, in turn, to the role that system occupies in our society. Thus, courts have held that there is a presumption of regularity in civil proceedings including jury deliberations. . . . As a general rule, a strong presumption of regularity attaches to every step of a civil proceeding, including jury deliberations, and the burden is on the party seeking a new trial to show affirmatively that irregularity exists. . . . The purpose of a jury poll is to ensure that no juror has been coerced or induced to agree to a verdict to which he [or she] has not fully assented." (Internal quotation marks omitted.) Id., 113.

Although regularity is presumed, this court previously held that "[n]eutral inquiry by the trial judge as to the meaning of a juror's response is not erroneous . . . . Only when such inquiry is coercive or seeks explanations, motives or information about occurrences in the jury room should it be found objectionable." (Citations omitted.) *Tough* v. *Ives*, 162 Conn. 274, 280, 294 A.2d 67 (1972). In *Tough*, a jury returned a unanimous verdict for the defendant, which the court ordered accepted and recorded. Id., 277. When the clerk polled the jury, however, one juror, when asked, " '[w]hat is your verdict?' " responded that she was " '[f]or the plaintiff.' " Id. The trial judge then asked the juror whether she was " 'for the [the defendant state highway commissioner] or for the lady [the plaintiff]?' " Id. The juror again replied that she was " '[f]or the lady.' " Id. In light of this apparent contradiction, the following neutral inquiry by the court occurred:

"The Court: I wonder . . . whether you understood the question. Was this verdict unanimous, Mr. Foreman, as far as you knew?

"[The Foreman]: Yes, Your Honor.

"The Court: Then what did you mean, [addressing the juror] . . . by saying you were for the lady?

"[The Juror]: Well, you told us to try to come to a unanimous conclusion by weighing the facts and perhaps considering that the other jurors had more in their favor and in that event I went along with the jury.

"The Court: So you did vote finally for the defendant?

"[The Juror]: Right.

"The Court: And what you meant to say, I gather then, was that originally you felt the other way.

"[The Juror]: That is right.

"The Court: But you now finally do vote for the defendant?

"[The Juror]: Yes.

"The Court: Verdict is accepted and recorded." (Internal quotation marks omitted.) Id., 277–78.

The plaintiff in *Tough* appealed, claiming that the court "erred in interrogating the juror . . . and requiring an explanation for her dissent . . . ." Id., 279. In distinguishing the trial judge's questioning from the inappropriate questioning that occurred in cases cited by the plaintiff, this court determined that those "cases envision heavy-handed conduct which coerces the juror or ignores his decision." Id. In contrast, "[t]he action by the trial court [in *Tough*] is wholly different. In the case at bar, there was no argument, by either court or counsel, with the juror. Nor did the court require an explanation from the juror as to whether she changed her mind or the reasons therefor. The questions asked sought only to elucidate the meaning of her statement; there was no further inquiry. When the juror stated that her verdict was for the defendant, there was no reason

to send the jury back for further deliberations and the court was not in error in accepting the verdict." Id., 280.

We are additionally mindful that trial courts have the opportunity to observe the demeanor of jurors during the receipt of a verdict and during individual polling. As this court frequently has observed, a trial court is in the best position to observe the demeanor of the parties, witnesses, jurors and others who appear before it. *D'Ascanio* v. *D'Ascanio*, 237 Conn. 481, 487, 678 A.2d 469 (1996) (trial court has "unique opportunity to view the evidence presented in a totality of circumstances, i.e., including its observations of the demeanor and conduct of the witnesses and parties, which is not fully reflected in the cold, printed record which is available to us" [internal quotation marks omitted]); *Kukanskis* v. *Jasut*, 169 Conn. 29, 32–33, 362 A.2d 898 (1975) ("[i]t is the trial court which had an opportunity to observe the demeanor of the witnesses and parties; thus, it is best able to judge the credibility of the witnesses and to draw necessary inferences therefrom"). We likewise recently observed that, in the context of jury polling, "[a] trial court ha[s] the distinct advantage of observing the jury throughout the entire trial, including the return of its verdict . . . ." *Wiseman* v. *Armstrong*, supra, 295 Conn. 121. As a result, we are "mindful of [a] trial court's comments that [a juror] was 'attentive,' " or, as in the present case, was surprised and confused at the polling process. Id.

In the present case, the trial judge, who was situated in the best position to observe F.C., found that the juror was surprised and confused by the polling proceedings or the question "is this your verdict?"[19] This finding is

---

[19] A similar situation prompted the trial court's inquiry in *Tough*, wherein the juror, initially confused by the question " '[w]hat is your verdict?' " confirmed during her colloquy with the trial court that what she meant was that she was initially for the plaintiff, but through deliberations she changed her mind and agreed with the final and unanimous defense verdict. *Tough* v. *Ives*, supra, 162 Conn. 277–78.

amply supported by the record. F.C.'s confusion was evident as soon as the jury returned to the courtroom. After the clerk first inquired of the entire jury "have you reached a verdict?" and the foreperson answered "[w]e have," F.C. spoke out and inquired "do we all answer?" F.C. made this interjection despite the trial court's earlier instruction that "[w]hen the jury is asked if it has reached a verdict, the *foreperson* should respond." (Emphasis added.) The trial court's finding that F.C. was confused at the individual polling is also supported in that the clerk twice read aloud to the jury their verdict for the defendant and corresponding interrogatory answers. At the conclusion of the second reading the clerk inquired, "[l]adies and gentlemen of the jury, do you agree that this is your verdict?" and the jurors responded with a collective "yes." As the trial court stated in its decision finding that the jury verdict was unanimous, "[t]here was no audible negative answer from any juror." Nonetheless, during individual polling when first asked "[F.C.], is this your verdict?" F.C. expressed confusion, asking "I . . . what exactly is this for again? I just . . . ." The trial court, similar to the court in *Tough*, reasonably interpreted this question, as well as F.C.'s subsequent questions, "you want us to admit it was hard?" and "[t]his is our final thing, right?" as evidence that F.C. was confused and the court proceeded to conduct a neutral inquiry. Because the trial court had the opportunity to observe the demeanor of F.C. during the entire trial, especially during the return of the verdict and the polling process, and was present when F.C. made the statements at issue, we appropriately defer to the trial court's observations of F.C. We further conclude that the trial court did not abuse its discretion in deciding that a neutral inquiry was warranted to ascertain whether F.C. did agree with the recently announced verdict. The trial judge then briefly and neutrally explained to F.C. that

the court was conducting "an individual polling of jurors one by one." The trial judge then directed the clerk to ask F.C. whether the jury's verdict was his once again, and the clerk did so. This time F.C. answered, "yes."

The trial court, after recognizing F.C.'s confusion, conducted a neutral inquiry, following which the court determined that F.C.'s final response was his operative answer. This conclusion is in accordance with the jurisprudence of this state, which provides that it is the juror's final answer that controls. *State* v. *Gullette*, 3 Conn. Cir. 153, 165, 209 A.2d 529 (App. Div. 1964), citing *Watertown Ecclesiastical Society's Appeal from Probate*, 46 Conn. 230, 233 (1878) ("[u]nder our practice, it is the last answer that makes the verdict"); see also *Josephson* v. *Meyers*, 180 Conn. 302, 309, 429 A.2d 877 (1980) ("[u]nder the procedure for receiving, accepting and recording a verdict which has been followed in our courts, the *final* assent of the jurors, given after the verdict has been read aloud by the clerk, accepted and ordered recorded by the court, and read aloud a second time by the clerk, makes the verdict" [emphasis added; internal quotation marks omitted]). We conclude that the trial court did not abuse its discretion in concluding that F.C.'s final answer was his operative answer and in determining that the jury's verdict in favor of the defendant was unanimous.

The plaintiff nevertheless contends that the trial court's inquiry was similar to the one that the Appellate Court held improper in *State* v. *Bell*, 13 Conn. App. 420, 537 A.2d 496 (1988). The plaintiff claims that, like in *Bell*, there was "undue influence from the court" and an atmosphere of "intense pressure and embarrassment" for F.C. to conform to the recently announced verdict. We disagree. In *Bell*, a juror was polled as to her verdict and she responded, "[d]o I have to answer that as a guilty or can I say something?" (Internal quotation marks omitted.) Id., 428 n.4. The

trial court explained to the juror that all she could say was whether the guilty verdict was her verdict. When polled a second time, the juror responded, "I can't say." (Internal quotation marks omitted.) Id. The trial court tried three additional times to ascertain the juror's verdict, and only after the fifth inquiry would the juror confirm that she agreed that the defendant was guilty. Id., 428–29 n.4.

The exchange in *Bell* is distinguishable from the brief and neutral inquiry undertaken by the trial court in the present case. Whereas the juror's response in *Bell*, " 'I can't say,' "[20] indicated that she had not decided whether the defendant was guilty of the polled charge; id., 428 n.4; F.C.'s first statement "what exactly is this for again?," demonstrated that he was confused with the polling process. The trial court was not presented with any indication that F.C. had not decided the issue of the defendant's liability. To the contrary, F.C. repeatedly demonstrated confusion with the polling process, both before and after his remark "[n]o, it's not my verdict." The plaintiff's claims as to "undue influence from the court" and "intense pressure and embarrassment" are wholly unsupported by the record.

### III

The plaintiff finally claims that the trial court improperly permitted the defendant to introduce evidence that the plaintiff's treating physicians had been negligent in support of the defendant's general denial that its conduct had caused her injuries. The plaintiff concedes that the defendant was entitled under its general denial to introduce evidence of another person's conduct as the proximate cause of the plaintiff's cardiac arrest.

[20] " 'I can't say' " was the remark that the Appellate Court found determinative as the point at which the trial court should have realized that the juror had not decided the defendant's guilt and therefore should have stopped the polling procedure. *State* v. *Bell*, supra, 13 Conn. App. 431.

She asserts, however, that it was improper for the trial court to permit the defendant to introduce evidence that such conduct had been negligent. Additionally, the plaintiff asserts that the introduction of the evidence "tainted" the jury's response to interrogatory number one as to the defendant's liability. The defendant responds that, because the jury did not reach the issue of causation, any purported mistake in admitting the evidence was harmless. We agree with the defendant.

The record contains the following additional undisputed facts and procedural history relevant to this issue. Prior to trial, the plaintiff filed a motion in limine to preclude evidence of the alleged negligence of the plaintiff's treating physicians, which the defendant opposed. The plaintiff asserted that evidence of the alleged negligence of her treating physicians was irrelevant, more prejudicial than probative, and likely to confuse or mislead the jury.[21] The trial court denied the plaintiff's motion without prejudice to renew it at trial with regard to any particular evidence offered by the defendant. The trial court concluded that the defendant had the right to present this evidence as part of its claim that the plaintiff's treating physicians were the proximate cause of her cardiac arrest. The trial court, however, also stated that the jury would be "cautioned that any such evidence received is limited to the issue of causation." During its charge on proximate causation, the trial court instructed the jury that it could also assess

---

[21] As part of her argument to the trial court that the evidence should not be admitted, the plaintiff claimed that the defendant could not apportion liability to the plaintiff's physicians, both because General Statutes § 52-572h did not apply in actions under the Connecticut Product Liability Act; see *Allard* v. *Liberty Oil Equipment Co.*, 253 Conn. 787, 756 A.2d 237 (2000); and because the physicians were not impleaded under principles of contribution or indemnity, and accordingly, were not parties to the pending action. The plaintiff has not raised these claims on appeal.

the defendant's alternative proximate cause evidence.[22] The trial court further instructed the jury that it could consider evidence of the treating physicians' negligence as an alternative proximate cause for the plaintiff's cardiac arrest.[23] When the jury returned its verdict, it answered only interrogatory number one, finding no liability on the part of the defendant. Interrogatory number one asked, "[h]as the [p]laintiff proven by a fair preponderance of the evidence that [Kling], by his oral communications to [Landesman] that turning down the pacemaker was an option, accompanied by his physical adjustment of the pacemaker to forty paces per minute, actually contradicted the [t]echnical [m]anual thereby vitiating and nullifying the manual's warnings?" Finding no liability, the jury returned a verdict for the defendant, thus precluding its consideration of interrogatory number two, which addressed causation of the plaintiff's injuries.

Our analysis is guided by the applicable standard of review. "The trial court's ruling on evidentiary matters

[22] The trial court instructed the jury that "the defendant may present any evidence to rebut the plaintiff's claim that [Kling's] statements and conduct were the cause of [the plaintiff's] cardiac arrest. In your consideration of whether [the plaintiff has] met [her] burden as to the element[s] of proximate cause, you should also consider evidence of alternative causes. In other words you should consider whether [the plaintiff's] cardiac arrest was caused solely by other persons or factors over which the defendant had no authority or control. In this case, [the defendant] cannot be held liable if you find that other persons or factors alone or in combination, either before or after September 14, 1998, were the sole cause of [the plaintiff's] cardiac arrest."

[23] The trial court instructed the jury that "[i]n connection with your assessment of the element of causation, you have heard evidence regarding the acts and omissions of [the plaintiff's] treating physicians, including [Landesman] and [Charles Kleinman]. You have further heard evidence that the negligence of these physicians, whether individually or combined, caused [the plaintiff's] cardiac arrest." The trial court then proceeded to define the standard of care for a physician and concluded by instructing the jury that it "should consider evidence of [the physicians'] actions and omissions and alleged negligence in your determination of the sole proximate cause of [the plaintiff's] cardiac arrest."

will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . . Even when a trial court's evidentiary ruling is deemed to be improper, we must determine whether that ruling was so harmful as to require a new trial. . . . In other words, an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . Finally, the standard in a civil case for determining whether an improper ruling was harmful is whether the . . . ruling [likely affected] the result." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Gilmore*, 289 Conn. 88, 128, 956 A.2d 1145 (2008). Moreover, "it is well established that, [i]n the absence of a showing that the jury failed or declined to follow the court's instructions, we presume that it heeded them." (Internal quotation marks omitted.) *Wiseman* v. *Armstrong*, supra, 295 Conn. 113.

We previously have held that when a jury does not reach an issue in returning a verdict, alleged improprieties relating to that issue are harmless. In *Kalams* v. *Giacchetto*, 268 Conn. 244, 246, 842 A.2d 1100 (2004), the plaintiff in a medical malpractice action appealed from the decision of the trial court granting the defendant's motion in limine precluding testimony from the plaintiff's expert witness. The jury returned a verdict for the defense, indicating on the interrogatory forms that the plaintiff had proved neither liability nor causation. Id., 249. On appeal, this court held that, even if the decision of the trial court granting the motion in limine was incorrect, the exclusion of the evidence was harmless because "[t]he jury was not required to reach

the issue of causation because, as evidenced by its answers to the jury interrogatories, it first determined that the defendant had not breached the standard of care. Accordingly, we conclude that it is not reasonably probable that testimony on causation would have affected the result." Id., 250; see also *Murphy* v. *Soracco*, 174 Conn. 165, 166, 383 A.2d 1350 (1978) (because jury verdict in favor of defendant in motor vehicle accident as to liability was supported by evidence, any error as to damages was harmless); *Klein* v. *Norwalk Hospital*, 113 Conn. App. 771, 780, 967 A.2d 1228 (relying on *Kalams* in holding that any error in precluding or admitting testimony in medical malpractice action was harmless because jury found no breach of standard of care and did not reach causation), cert. granted, 292 Conn. 913, 973 A.2d 662 (2009); *Rubel* v. *Wainwright*, 86 Conn. App. 728, 747, 862 A.2d 863 (citing *Kalams* in holding that any error in permitting testimony in support of defendant's special defense of comparative negligence was harmless because jury found that plaintiff failed to demonstrate defendant was negligent in motor vehicle accident), cert. denied, 273 Conn. 919, 871 A.2d 1028 (2005).

Even if the evidence of the physicians' negligence was improperly admitted, we must conclude that it is not reasonably probable that the evidence affected the result of the trial—that the defendant was not liable to the plaintiff. In accordance with our jurisprudence and the lack of evidence to the contrary, we presume that the jury followed the trial court's charging instructions and did not review any of the alternative proximate cause evidence when considering interrogatory number one as to the defendant's liability. See *Gajewski* v. *Pavelo*, 229 Conn. 829, 837, 643 A.2d 1276 (1994) ("[i]t is presumed that the jury follows the instructions given by the court"). By answering "no" on interrogatory number one as to the defendant's liability, the jury did not

reach interrogatory number two and, consequently, the jury did not consider evidence of the negligence of the plaintiff's treating physicians. As a result, even if evidence of the treating physicians' negligence was improperly admitted, it was harmless.

The judgment is affirmed.

In this opinion the other justices concurred.