******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JILL GILBERT CALLAHAN *v.* JAMES CALLAHAN
(AC 40723)

Alvord, Moll and Pellegrino, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dissolved, appealed to this court from the judgment of the trial court resolving certain postjudgment motions that the parties had filed. The plaintiff claimed, inter alia, that the trial court improperly granted the defendant's motion to modify his alimony obligation and ordered that the modification apply retroactively. The dissolution court had granted the defendant's motion to open the dissolution judgment and issued substitute financial orders. This court thereafter reversed the dissolution court's granting of the motion to open and remanded the matter to the trial court with direction to reinstate the original financial orders. The plaintiff thereafter filed a motion for contempt, claiming that the defendant had failed to pay her certain amounts set forth in the dissolution court's original financial orders. The trial court declined to find the defendant in contempt and determined that the effective date for the running of interest on the amounts at issue was the date on which the parties' appeals to this court were finally determined. The court subsequently granted the defendant's motion to modify alimony, and the plaintiff appealed to this court. The trial court thereafter determined that it lacked jurisdiction over a motion that the plaintiff had filed requesting that the court order the defendant to endorse certain insurance checks for damage to the parties' former marital home. The court also denied another motion for contempt that the plaintiff filed regarding documents necessary to transfer to the defendant the plaintiff's interest in certain companies that the parties owned, and the plaintiff filed an amended appeal with this court. *Held*:

1. The trial court did not abuse its discretion in granting the defendant's motion to modify his alimony obligation and determining that the defendant had established a substantial change in circumstances due to his lower earning capacity: that court's finding that the defendant's earning capacity had decreased, which it based on the companies' profits, was not clearly erroneous, as the court credited testimony by the defendant's expert witness about the companies' financial statements, the defendant testified that he would not be able to obtain a job with a Wall Street bank or hedge fund, the court found it significant that the defendant had not worked on Wall Street in twenty years, and the transfer of the plaintiff's interest in the companies to the defendant, which had been ordered by the dissolution court, had not yet occurred and prevented the defendant from selling the companies; moreover, the court was not required to determine the defendant's earning capacity on the basis of what he might theoretically earn if he were to sell the companies and pursue employment opportunities in the marketplace, and the court used the same formula that the dissolution court had used to determine the defendant's earning capacity.

2. The trial court did not abuse its discretion in ordering that the modification of the defendant's alimony obligation be retroactive three years and requiring the plaintiff to repay him certain sums of alimony that she had received; that court found it equitable and appropriate under the circumstances to modify the defendant's alimony obligation, pursuant to statute (§ 46b-86 [a]), retroactive to the date that the original motion was served on the plaintiff three years earlier because there had been a substantial delay in hearing the motion, which was pending when the court treated an amended motion to modify that the defendant had filed as a continuation of his original motion to modify, until the court issued its decision.

3. The plaintiff's claim that the trial court lacked the authority to suspend the defendant's alimony payments was moot; a reversal of the court's suspension of alimony payments would not afford the plaintiff any practical relief, as the trial court had factored the suspension of the payments into its calculation of the defendant's overpayment of alimony and

reduced the overpayment by the amount of alimony that accrued during the suspension.

4. The plaintiff could not prevail on her claim that the trial court, on remand, improperly failed to determine that the reinstated financial orders were effective as of the date of the dissolution judgment, which thereby reduced the value of her property award by depriving her of accrued interest on the defendant's debt to her: the trial court properly interpreted this court's remand order in determining that the judgment was effective as of September 8, 2015, the date on which the parties' appeals to this court were finally determined, as the date employed in the remand order identified which financial orders were to be reinstated, the remand order constituted a reversal of a judgment, which commanded a new effective date, and because the original financial orders were superseded by those contained in the dissolution court's intervening judgment, which this court reversed, the judgment subsequently directed, which mandated a reinstatement of the superseded financial orders, was not effective retroactively; moreover, it was not reasonable to interpret the remand order as direction to the trial court to reinstate the original financial orders retroactive to the date of the dissolution judgment, and if this court intended to direct the trial court to reinstate the original financial orders retroactive to the date of the dissolution judgment, it would have included language directing the trial court accordingly; furthermore, because the sums set forth in the dissolution court's financial orders were no longer payable once that court opened the dissolution judgment, the plaintiff's claim that she should be compensated for the loss of the use of that money was without foundation.

5. This court found unavailing the plaintiff's claim that the trial court erred in ordering her to execute certain documents to transfer to the defendant her interest in the companies: contrary to the plaintiff's claim that the court improperly required her to execute a certain complex commercial document, the court properly credited the testimony of the defendant's expert witness that a transfer of the plaintiff's interest in the companies would require fulsome representations and warranties in order to preserve the fair market value of the companies, both parties and the court envisaged a potential sale of the companies, as the amount of the promissory note correlated with the value of the plaintiff's 50 percent interest in the companies, the inclusion of a release in the documents did not constitute a modification of the dissolution judgment, and the plaintiff presented no evidence to refute the testimony of the defendant's expert witness that such a release was customary; moreover, the plaintiff presented no evidence to demonstrate her claimed inability to make particular representations in the documents, and although there were inconsistencies in the documents, for which the trial court acknowledged that amendments were required prior to the execution of the documents, the plaintiff neither set forth the particular provisions in her motion for contempt nor identified them to the trial court.

6. The plaintiff could not prevail on her claim that the trial court improperly concluded that it lacked subject matter jurisdiction to require that the defendant endorse two insurance checks for postdissolution property damage to the parties' former marital home, which the dissolution court had awarded to the plaintiff; the trial court lacked authority to revisit its property distribution orders or to enter additional property distribution orders to compensate the plaintiff for the alleged postjudgment reduction in value of the home, and, to the extent that the proceeds of the insurance checks were viewed as a new asset that was acquired pursuant to a contract of insurance that was in effect after the parties' marriage had been dissolved, such proceeds would not be marital property distributable under the statute (§ 46b-81) governing the distribution of marital property.

Argued April 18—officially released September 17, 2019

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Munro, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court; thereafter, the court, *Munro, J.*, granted the

defendant's motion to open the judgment and entered certain financial orders, and the plaintiff appealed to this court, which reversed in part the trial court's judgment and remanded the case to that court for further proceedings; subsequently, the court, *Hon. Michael E. Shay*, judge trial referee, granted the defendant's motion to modify alimony and rendered judgment thereon, from which the plaintiff appealed to this court; thereafter, the court, *Diana, J.*, denied the plaintiff's motions for contempt and for an order regarding certain insurance checks, and the plaintiff filed an amended appeal. *Appeal dismissed in part; affirmed.*

*Laura W. Ray*, for the appellant (plaintiff).

*Campbell D. Barrett*, with whom were *Jon T. Kukucka* and, on the brief, *Johanna S. Katz*, for the appellee (defendant).

*Opinion*

ALVORD, J. In this postjudgment dissolution matter, the plaintiff, Jill Gilbert Callahan, appeals from the judgments of the trial court, rendered on remand from this court, granting a motion to modify alimony filed by the defendant, James Callahan, and issuing additional postjudgment orders. On appeal, the plaintiff claims that the court (1) erred in granting the defendant's motion to modify alimony, (2) abused its discretion in modifying alimony retroactively, (3) lacked the legal authority to suspend the defendant's alimony payments to her as a condition of granting her motion for a continuance, (4) erred in determining the effective date of financial orders that this court mandated be reinstated, (5) erred in ordering her to execute certain documents to transfer her interest in the companies owned by the parties, and (6) improperly concluded that it lacked subject matter jurisdiction to require the defendant to endorse two insurance checks. We dismiss as moot the plaintiff's third claim regarding the suspension of alimony payments and affirm the judgments of the trial court in all other respects.[1]

The following facts and procedural history are relevant to our resolution of the appeal. The parties were married in 1987 and raised three children, all adults at the time of the dissolution trial. In 2009, the plaintiff filed a complaint seeking dissolution of her marriage to the defendant. The matter was tried to the court, *Munro*, *J.*, in March, 2012. On May 8, 2012, the court issued a memorandum of decision rendering judgment dissolving the parties' marriage on the ground of irretrievable breakdown, and entering property division and alimony orders (May, 2012 dissolution judgment). On June 15, 2012, the defendant filed a motion to open the judgment of dissolution and attendant financial orders, which was granted on November 6, 2012. The court then held an evidentiary hearing and, in a February 27, 2014 memorandum of decision, issued substitute financial orders (February, 2014 decision).

Both parties filed appeals. This court, on May 5, 2015, issued a decision reversing the trial court's granting of the motion to open the judgment and remanded the matter with direction to reinstate the May, 2012 financial orders. *Callahan* v. *Callahan*, 157 Conn. App. 78, 101, 116 A.3d 317, cert. denied, 317 Conn. 913, 116 A.3d 812 (2015), and cert. denied, 317 Conn. 914, 116 A.3d 813 (2015).

Following this court's resolution of the parties' prior appeals, the plaintiff filed, among several motions, a motion for contempt dated July 6, 2015. In her motion, she argued, inter alia, that the defendant had refused to comply with the judgment in that he had failed to pay amounts set forth in the May, 2012 financial orders, plus interest, which she contended had begun accruing

in 2012. On May 4, 2016, the court, *Hon. Michael E. Shay*, judge trial referee, issued a memorandum of decision declining to find the defendant in contempt, in which it concluded that "the effective date for the running of interest is September 8, 2015," the date that, the court determined, the defendant had exhausted all the appellate avenues that had been available to him.

In November, 2016, the court, *Hon. Michael E. Shay*, judge trial referee, began hearing evidence on a motion to modify alimony originally filed by the defendant on May 19, 2014, and amended on October 15, 2015. In its memorandum of decision filed August 1, 2017, the court found that the defendant had established a substantial change in circumstances and granted his motion to modify alimony. On August 7, 2017, the plaintiff filed this appeal.

While this appeal was pending, the court, *Diana, J.*, heard additional motions filed by the plaintiff. On April 3, 2018, the court concluded that it lacked jurisdiction over the plaintiff's motion requesting that the court order the defendant to endorse two Chubb property damage insurance checks.[2] On April 10, 2018, the court denied the plaintiff's motion for contempt regarding the documents necessary to transfer the plaintiff's interest in companies owned by the parties and issued a remedial order. On April 20, 2018, the plaintiff filed an appeal challenging the April 3 and 10, 2018 orders, which this court treated as an amendment to the original appeal filed on August 7, 2017. Additional facts and procedural history will be set forth as necessary.

I

The plaintiff's first claim on appeal is that the trial court erred in finding that the defendant had established a substantial change in circumstances justifying a modification in alimony. She argues that the trial court erroneously considered evidence showing a change in the defendant's earnings only from the companies owned by the parties, whereas the dissolution court based its original alimony award on the defendant's general earning capacity independent of his earnings from the companies. Thus, she argues that the trial court failed to compare "apples to apples . . . ."[3] We disagree.

The following additional facts and procedural history are relevant to this claim. In 1995, the parties established three companies together, Pentalpha Group, LLC, Pentalpha Funding, LLC, and Pentalpha Capital, LLC. The plaintiff owned 51 percent of each of the three entities and the defendant owned 49 percent. In 2005, a fourth Pentalpha entity was created, Pentalpha Surveillance, of which 100 percent was owned by the defendant (collectively, the companies). The court found that the companies "work in various fields: as an investment advisor, as a trading and brokerage company, as a broker dealer and as an oversight company, all ostensibly

in the loan market, particularly working with asset-backed debt."

In its May, 2012 dissolution judgment, the court ordered the defendant to pay $60,000 per month in alimony, until the death of either party, the remarriage of the plaintiff, or as determined by the court, pursuant to General Statutes § 46b-86 (b). In so ordering, the court stated: "The alimony order is predicated on earnings, including member distributions to the defendant of up to $2,000,000 per year. The court notes that the plaintiff's valuation expert, Barry Sziklay, concluded that a comparable compensation for the defendant, as a key person operating on Wall Street, would be at least in the [$1 million to $2 million] range annually. Ultimately, in the valuation model that he used, Sziklay attributed 50 percent of the pretax profits to the defendant. For 2010, that resulted in adjusted compensation of $1,976,312. As of the second quarter's completion for 2011, that adjusted compensation attributed to the defendant was $684,880. The defendant provided no contrary evidence. The court finds this approach reasonable. No evidence was adduced of any increase in liabilities. Accordingly, finding earnings attributable to the defendant in the amount of $2,000,000 gross is conservative, the court adopts it as a finding of fact as to the present earning capacity of the defendant at Pentalpha."

On May 19, 2014, while the parties' prior appeals remained pending, the defendant filed a motion to modify his alimony. In that motion, he represented that the companies were "experiencing a cash flow crisis" and that the defendant's earning capacity at the companies was no longer $2 million. The defendant argued that postjudgment misconduct of the plaintiff, on which the trial court relied in opening the dissolution judgment, had diminished the value of the companies, thereby reducing the earnings from which he pays alimony. The motion was not pursued while the parties' prior appeals were pending. On October 15, 2015, the defendant filed an amended motion for modification of alimony, again arguing that his income had decreased since the date of dissolution.

The court began hearing evidence on the defendant's motion on November 8, 2016. The defendant testified that, taking the four companies together, the cash collected on an annual basis had decreased substantially since the May, 2012 dissolution judgment. As to the potential for other employment, the defendant testified that he did not believe it would be possible for him to leave the companies and get a new job. Specifically, he stated: "The market has taken an invention that I've devised—this surveillance, this oversight, to investor confidence. They've made me an insider on 140 deals. I can't go show up and work at some Wall Street bank or some hedge fund; they would have to preclude me from the one thing that I know about because I'm

the insider."

Both parties presented expert testimony. The defendant presented the testimony of Attorney Mark Harrison. Harrison testified that he used the compensation methodology set forth in the May, 2012 dissolution judgment, pursuant to which 50 percent of the pretax profits of three of the companies (Pentalpha Funding, LLC, Pentalpha Group, LLC, and Pentalpha Capital, LLC) as shown in the companies' audited financial statements, was attributed to the defendant as reasonable compensation. Harrison performed the same analysis for the years 2012–2015 to arrive at reasonable compensation attributable to the defendant in the amount of $210,000. He also performed the same analysis including profits from Pentalpha Surveillance, which was omitted from the calculations in the May, 2012 dissolution judgment, to arrive at reasonable compensation attributable to the defendant in the amount of $370,000. The audited financial statements for each of the four companies, on which Harrison relied, also were entered into evidence.

Harrison testified that the defendant was not earning sufficient money to satisfy his alimony obligations. Specifically, he testified that in order to satisfy the defendant's obligations pursuant to the May, 2012 dissolution judgment, he would be "not only taking the 50 percent of income out of the company, he's taking it all out as well as withdrawing the excess capital that was valued in it to get the cash flow to be able to pay his obligations pursuant to the judgment and live his life."

The plaintiff presented the expert testimony of Sziklay, whose formula attributing 50 percent of the pretax profits of the companies to the defendant was used by the court in the May, 2012 dissolution judgment to reach an earning capacity of $2 million. In his testimony during the hearing on the motion for modification, Sziklay agreed with the numbers used by Harrison to determine 50 percent of the pretax profits of the companies. He disagreed, however, with Harrison's conclusion that the defendant had an earning capacity of $210,000. According to Sziklay's December, 2016 testimony, the defendant's earning capacity of $2 million, which was found by the dissolution court in May, 2012, remained reasonable.

In its memorandum of decision filed August 1, 2017, the court determined that the defendant had established a substantial change in circumstances due to his lower earning capacity. The court credited Harrison's testimony that the defendant had been using his personal assets to meet his marital obligations. Finding that Harrison had "used the same basic format that . . . Sziklay used at the time of trial," the court relied on Harrison's calculations using the profits of all four companies. The court found that the defendant had an earning capacity of $370,000 per year, as of January 1, 2016, and ordered the defendant to pay $12,000 per month in alimony

until "the death of either party or the remarriage of the plaintiff, or the entry into a civil union by her, whichever shall sooner occur." The court found, with respect to the period of July 1, 2014 through December 31, 2015, that the defendant had an earning capacity of $850,000 per annum and a net income of $489,692. It determined the alimony due for that period to be $24,000 per month.

On appeal, the plaintiff argues that the court was required to find the defendant's earning capacity independent of the companies. We disagree.

"We review the court's judgment granting a motion to modify alimony payments under an abuse of discretion standard. An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action."[4] (Internal quotation marks omitted.) *McRae* v. *McRae*, 139 Conn. App. 75, 80, 54 A.3d 1049 (2012). "[T]he trial court's findings [of fact] are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Steller* v. *Steller*, 181 Conn. App. 581, 593, 187 A.3d 1184 (2018).

"[General Statutes §] 46b-86 governs the modification or termination of an alimony or support order after the date of a dissolution judgment. When, as in this case, the disputed issue is alimony . . . the applicable provision of the statute is § 46b-86 (a), which provides that a final order for alimony may be modified by the trial court upon a showing of a substantial change in the circumstances of either party. . . . Under that statutory provision, the party seeking the modification bears the burden of demonstrating that such a change has occurred. . . . To obtain a modification, the moving party must demonstrate that circumstances have changed since the last court order such that it would be unjust or inequitable to hold either party to it. Because the establishment of changed circumstances is a condition precedent to a party's relief, it is pertinent for the trial court to inquire as to what, if any, new circumstance warrants a modification of the existing order." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Olson* v. *Mohammadu*, 310 Conn. 665, 671–72, 81 A.3d 215 (2013). In determining whether the moving party has established a substantial change in circumstances, the trial court is "free to credit

or reject all or part of the testimony given . . . . On review, we do not reexamine the court's credibility assessments." *Zilkha* v. *Zilkha*, 167 Conn. App. 480, 489, 144 A.3d 447 (2016).

The plaintiff argues that the court erred in calculating the defendant's earning capacity on the basis of the companies' profits alone, rather than on the defendant's earning capacity independent of the companies.[5] "While there is no fixed standard for the determination of an individual's earning capacity . . . it is well settled that earning capacity is not an amount which a person can theoretically earn, nor is it confined to actual income, but rather it is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." (Internal quotation marks omitted.) *Fritz* v. *Fritz*, 127 Conn. App. 788, 796, 21 A.3d 466 (2011).

Bearing in mind that a party's earning capacity is not calculated by reference to amounts the party can theoretically earn, nor is earning capacity fixed at any one moment in a career, we are unpersuaded that the court abused its discretion in grounding its finding of the defendant's earning capacity on the profits of the companies. The court had before it the defendant's testimony that he would not be able to obtain a job with a Wall Street bank or hedge fund because the nature of the companies' business had made him an "insider," and the court found significant that the defendant had not worked on Wall Street in twenty years. Moreover, the transfer of the plaintiff's interest in the companies to the defendant, which had been ordered by the court in the May, 2012 dissolution judgment, had not yet occurred, which the defendant testified prevented him from selling the companies. Thus, the court was not required to make its finding of the defendant's earning capacity on the basis of what the defendant might theoretically earn were he to sell the companies he founded and ran for approximately twenty years to pursue limited opportunities for employment in the marketplace.

We conclude that the court's factual finding that the defendant's earning capacity had decreased from $2 million at the time of dissolution to $370,000 at the time of the modification was not clearly erroneous. The court expressly credited Harrison's testimony and accompanying exhibits showing 50 percent of the pretax profits of the companies as set forth in the companies' audited financial statements, and the plaintiff's expert agreed with the numbers used in Harrison's calculations. Moreover, the court found the defendant's earning capacity using the same formula that the court used in its May, 2012 dissolution judgment to calculate the defendant's earning capacity. The court's findings regarding a substantial change in circumstances are supported by the record, and, thus, we conclude that the court did not abuse its discretion in granting the defendant's motion

to modify alimony.

## II

The plaintiff's second claim is that the court abused its discretion "when it made its alimony modification order retroactive three years to July, 2014, and ordered the plaintiff to repay the defendant $1.3 million in alimony already received." She argues that the defendant's motions to modify alimony were predicated on the court's February, 2014 decision opening the May, 2012 dissolution judgment, which this court vacated, and, thus, retroactivity to the date of the filing of his motion should be barred. We disagree.

The following additional facts and procedural history are relevant to this claim. In its August 1, 2017 memorandum of decision granting the defendant's motion to modify alimony, the court, citing the marshal's return, found that the plaintiff was served in hand with the defendant's motion for modification on June 9, 2014. Noting that the defendant had filed an amended motion for modification dated October 15, 2015, seeking identical relief, the court found that "at the time of trial, the original motion was still pending and undecided . . . ." Relying on § 46b-86 (a), the court concluded that "any retroactive relief would relate back to the date of the service of the original motion . . . and that under all the facts and circumstances, it is equitable and appropriate to enter an order of modification retroactive to July 1, 2014." (Citation omitted.)

The plaintiff's claim on appeal is that retroactivity should be barred on the ground that both the original and amended motions to modify were predicated on findings contained in the court's February, 2014 judgment, which was subsequently vacated. She argues that the defendant changed the basis of his motion late in its pendency, and therefore retroactivity is improper because notice, required in order to support retroactive modification, "is not meaningful if the grounds for the motion are changed years later."

The issue of whether the court properly made the modification retroactive is reviewed for abuse of discretion. See *LeSueur* v. *LeSueur*, 172 Conn. App. 767, 783, 162 A.3d 32 (2017) (court had discretion to make child support modification retroactive to any time between date motion was served and date motion was decided that was reasonably supported by record); *Cannon* v. *Cannon*, 109 Conn. App. 844, 850, 953 A.2d 694 (2008) ("[t]he record provides support that the court acted within its discretion when it ordered the unallocated alimony and child support payments retroactive to the date of service for the motion for modification"). Therefore, we apply the same standard of review set forth in part I of this opinion.

Pursuant to § 46b-86 (a), "[n]o order for periodic payment of permanent alimony or support may be subject

to retroactive modification, *except that the court may order modification with respect to any period during which there is a pending motion for modification of an alimony or support order from the date of service of notice of such pending motion upon the opposing party* pursuant to section 52-50." (Emphasis added.) "We have held previously that parties must comply strictly with § 46b-86 (a) before a court may determine whether to retroactively modify support orders." (Internal quotation marks omitted.) *LeSueur* v. *LeSueur*, supra, 172 Conn. App. 780.

"Although there is no bright line test for determining the date of retroactivity of child support [or alimony] payments, this court has set forth factors that may be considered. Specifically, in *Hane* [v. *Hane*, 158 Conn. App. 167, 176, 118 A.3d 685 (2015)], we expressly noted that a retroactive award may take into account the long time period between the date of filing a motion to modify, or . . . the contractual retroactive date, and the date that motion is heard . . . . The court may examine the changes in the parties' incomes and needs during the time the motion is pending to fashion an equitable award based on those changes." (Internal quotation marks omitted.) *Malpeso* v. *Malpeso*, 189 Conn. App. 486, 507, 207 A.3d 1085 (2019). "Moreover, § 46b-86 (a) accords deference to the trial court by permitting it to make a modification to a party's child support obligation retroactive to '*any* period during which there is a pending motion for modification.' " (Emphasis in original.) *LeSueur* v. *LeSueur*, supra, 172 Conn. App. 780.

In the present case, the defendant's motion for modification was served on June 9, 2014, and an amended motion was filed on October 15, 2015. In both the original and amended motions, the defendant alleged that there had been a substantial change in circumstances, in that the companies were "experiencing a cash flow crisis" and that the defendant's earning capacity at the companies was no longer $2 million. In his amended motion, he again alleged a substantial change of circumstances on the basis of the diminution of his income since the May, 2012 dissolution judgment. Although the defendant referenced that the plaintiff's actions affected the companies' profitability, the substantial change in circumstances alleged was that the companies were "experiencing a cash flow crisis and [the defendant's] earning capacity at the companies is not $2 million." Thus, the substantial change in circumstances to be established by the defendant at trial was the cash flow crisis. Significantly, the court stated in its memorandum of decision that it had not taken into consideration allegations three and six of the defendant's motion, which referenced the plaintiff's alleged misconduct.

The court found, under the facts and circumstances

of the present case, that it was equitable and appropriate to modify the defendant's alimony obligations retroactively. Those circumstances included the "substantial delay" in hearing the defendant's motion, which spanned more than three years. See *Cannon* v. *Cannon*, supra, 109 Conn. App. 851 (modification retroactive three years to date of service for motion not abuse of discretion). The original motion, served on June 9, 2014, was pending pursuant to § 46b-86 (a) until the court, which treated the amended motion as a continuation of the original motion, issued its memorandum of decision filed August 1, 2017. Given the circumstances, it was not an abuse of discretion for the court to order the modification of the defendant's alimony obligation retroactive to July 1, 2014.

### III

The plaintiff's third claim on appeal is that the court lacked the legal authority to suspend the defendant's alimony payments as a condition of granting her motion for a continuance. She further claims that the court erred in refusing her request to withdraw her motion for a continuance and allow the trial to proceed. The defendant responds that the plaintiff's claim is not justiciable because the plaintiff was not harmed by the court's decision, and there is no practical relief that this court can afford her. We conclude that this court lacks subject matter jurisdiction over this claim on the ground of mootness.[6]

The following additional facts and procedural history are relevant to our resolution of this claim. The defendant's motion for downward modification of alimony; see part II of this opinion; was filed on May 19, 2014, and amended on October 15, 2015. A trial on the motion was held over the course of approximately fifteen trial days, from November, 2016, through final argument on June 28, 2017. A decision on the motion was rendered August 1, 2017, on which date the trial court issued its memorandum of decision modifying the defendant's alimony obligation.

On January 31, 2017, the plaintiff's counsel informed the court that she was requesting a continuance because the plaintiff's slipped disk had worsened and she was placed on bed rest indefinitely. The defendant's counsel objected to the continuance on the ground that it was "yet another in a very long list of continuance requests in this case." He further requested that the court suspend the alimony order subject to recalculation upon the conclusion of evidence in the event the court continued the matter. The court denied the motion for a continuance. When the afternoon session commenced, the plaintiff's counsel objected to proceeding in the absence of the plaintiff, and the court stated that it had looked at the number of continuances in the case and that a "good portion of them" had been accorded to the plaintiff or the plaintiff's counsel.[7]

During a court appearance on February 24, 2017, the court took up the plaintiff's motion for a continuance. The court requested that both parties provide updated financial affidavits and that the plaintiff's counsel provide a medical report that would enable the court to determine whether the plaintiff might be able to return to court to testify or whether alternative methods would be needed to secure her testimony. The court then expressed concern that the defendant's motion for modification had been pending for a long period of time. Indicating that it was required to balance the rights of both parties, including the plaintiff's right to attend the hearing and assist her counsel and the defendant's right to have his motion heard in a timely fashion, the court stated that it would consider argument during the parties' next scheduled court appearance as to whether it should suspend prospectively and temporarily the defendant's alimony payment in whole or in part. The court stated: "[T]he way I view suspension is it does not terminate the alimony. It continues to accrue subject to a final decision." Although the court was unaware of any precedent for suspending the alimony payment, it indicated that it had given the matter considerable thought and believed such an action was within the authority of the court. It also invited the parties to identify any relevant precedent.

On March 28, 2017, the parties appeared before the court, and the court described the issue to be heard as "whether or not it's appropriate under all the circumstances to suspend the alimony, and I explained what I meant by suspend, which is not terminate, not modify, just simply suspend payment in whole or in part until a final decision is reached . . . ." Having presided over eight days of trial and heard the testimony of both parties' experts and the defendant, the court stated that it had a considerable body of evidence to assist its consideration of a motion to suspend. Following argument, the court found that it was equitable to suspend the full alimony payment for a period of three months. The court considered it important that the defendant was current on his alimony payments, which the court found he was paying out of assets that were awarded to him in the original dissolution judgment. The court indicated that it would revisit the issue in three months but invited the parties to return to court sooner in the event that the plaintiff's medical condition resolved in the interim.

Following the court's ruling, the plaintiff's counsel sought the opportunity to consult with the plaintiff as to whether she wanted to allow the proceedings to continue in her absence and continue receiving alimony payments or whether she maintained her request for a continuance with the knowledge that alimony payments would be suspended. Her counsel further argued that to the extent the court's granting of the continuance

was conditioned on accepting a suspension of alimony, the plaintiff should be able to decide whether to accept the condition or withdraw the motion. The court rejected that argument and indicated that the motion had already been brought and decided.[8]

On June 28, 2017, the parties appeared for final argument on the defendant's motion to modify alimony, and the court heard argument as to whether the suspension of the alimony payment should continue. The court modified its order and required the defendant to pay $10,000 monthly in alimony until such time as the court rendered its decision on the defendant's motion for modification. Again, the court emphasized that it had ordered a suspension. It stated: "This is . . . under no circumstances . . . a modification. That's to be decided. This is a suspension. . . . The payment of [the $60,000 per month] was suspended. But as we all know . . . if the court modifies and goes retroactive, that . . . ultimately becomes a matter for a . . . mathematical adjustment. So, this is in no way, shape or form a . . . modification or prejudging of the circumstances . . . ."

In its August 1, 2017 memorandum of decision granting the defendant's motion for modification, the court reiterated that the alimony had continued to accrue during the suspension of the defendant's alimony obligation. After finding a substantial change of circumstances and modifying the defendant's alimony retroactive to July 1, 2014, the court took into account the suspension of the defendant's alimony obligation in calculating the defendant's overpayment in the amount of $1,330,000.[9]

As a threshold matter, the defendant argues that the plaintiff was not harmed by the court's decision suspending the defendant's alimony obligation and, therefore, her claim is not justiciable. "Subject matter jurisdiction [implicates] the authority of the court to adjudicate the type of controversy presented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The objection of want of jurisdiction may be made at any time . . . [a]nd the court or tribunal may act on its own motion, and should do so when the lack of jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings." (Internal quotation marks omitted.) *Kennedy* v. *Kennedy*, 109 Conn. App. 591, 598–99, 952 A.2d 115 (2008); see also *Altraide* v. *Altraide*, 153 Conn. App. 327, 332, 101 A.3d 317 ("[m]ootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction" [internal quotation marks omitted]), cert. denied, 315 Conn. 905, 104 A.3d 759 (2014).

"[T]he existence of an actual controversy is an essential requisite to appellate jurisdiction; it is not the province of appellate courts to decide moot questions, disconnected from the granting of actual relief or from the determination of which no practical relief can follow. . . . In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Internal quotation marks omitted.) *Zoll* v. *Zoll*, 112 Conn. App. 290, 297–98, 962 A.2d 871 (2009). In *Zoll*, this court concluded that it lacked subject matter jurisdiction over a claim that the trial court, on September 13, 2006, had improperly vacated a prior order of the court staying the defendant's alimony obligation. Id., 298. In its subsequent memorandum of decision resolving the defendant's motion to modify alimony, issued on March 2, 2007, the court instructed that its new alimony order was retroactive to June 14, 2006. Id. Because the March, 2007 judgment had retroactive effect, a reversal of the September, 2006 judgment would provide no benefit to the defendant. Thus, the claim was rendered moot. Id.

In the present case, the court expressed on multiple occasions that, although it was ordering a temporary suspension of the defendant's payment of his alimony obligation, the alimony continued to accrue during the suspension, and the court would employ a calculation in its final orders reflecting the suspension. In its memorandum of decision modifying the defendant's alimony obligation retroactive to July 1, 2014, the court factored the suspension of payments into its calculation of the defendant's overpayment.[10] Thus, a reversal of the court's suspension of alimony payments would not afford the plaintiff any practical relief because the amount of the defendant's overpayment was reduced by the amount of alimony that accrued during the suspension. Thus, the issue on appeal is moot and, as a result, we do not reach the merits of the plaintiff's claim. See *Altraide* v. *Altraide*, supra, 153 Conn. App. 332.

IV

The plaintiff's fourth claim on appeal is that the court, on remand, erred in determining that the May, 2012 financial orders, which this court ordered reinstated; see *Callahan* v. *Callahan*, supra, 157 Conn. App. 101; were effective as of September 8, 2015, the date on which the plaintiff's and the defendant's appeals to the Appellate Court were finally determined. She argues that the financial orders were effective as of May, 2012, and thus, the defendant is responsible for interest that began accruing according to the payment schedule provided in the original judgment of dissolution. She contends that the court's determination of a September, 2015 effective date "improperly reduced the value of [the] plaintiff's property award by: (1) three years of accrued interest on [the defendant's] debt from May, 2012 through September 8, 2015; and (2) the loss of

default interest on his overdue installment payments on his remaining debt." The defendant responds that the trial court correctly determined the effective date of the judgment. We agree with the defendant.

The following additional facts and procedural history are relevant to our resolution of this claim. As noted previously, the court issued a memorandum of decision dissolving the parties' marriage on May 8, 2012. Paragraph 11 of the court's order provides: "Within sixty (60) days the plaintiff shall transfer to the defendant all of her right, title and interest to the Pentalpha companies. The defendant shall, *coincident therewith*, sign a promissory note secured on the stock and accounts of the Pentalpha companies for $6,000,000 that *shall be paid at the following rate to the plaintiff: $1,000,000 per year, every year commencing with the first payment on June 1, 2012, and on every June 1 thereafter until paid in full. Said note shall bear interest at the rate of 5 percent per year and may be prepaid. If the defendant is in default of any payment, the entire note shall bear interest at the rate of 10 percent per year until the default is cured.* If any of the installments are not timely paid, the defendant shall pay the plaintiff's reasonable attorney's fees and cost[s] of collection. The plaintiff may perfect her security interest on the stock and the Pentalpha accounts at her cost."[11] (Emphasis added.). Paragraph 12 of the court's order provides: "The defendant shall pay to the plaintiff the sum of $600,000 as an additional property order within ninety (90) days. *If defendant fails to pay in a timely manner, the entire sum outstanding shall bear interest at the rate of 5 percent per annum until paid in full.*" (Emphasis added.)

On June 15, 2012, the defendant filed a motion to open the judgment, arguing that the plaintiff had made certain unauthorized postjudgment withdrawals from company accounts. He requested that the court "open and set aside the May 8, 2012 judgment of dissolution and attendant financial orders and . . . hold a new trial as to all financial issues." In the alternative, he requested that the court "open its judgment and . . . enter new financial orders that take into account the plaintiff's unauthorized withdrawal of funds from the Pentalpha companies."

On November 6, 2012, the court opened the judgment, ordering court-supervised appropriate discovery and a hearing to provide evidence for the court to "find such facts as are necessary to enter new financial orders, as may be necessary, that take into account the plaintiff's unauthorized withdrawal of funds from the Pentalpha companies." After a period of discovery and a hearing, the court issued what this court described as "substitute financial orders" on February 27, 2014. *Callahan* v. *Callahan*, supra, 157 Conn. App. 86. In its 2014 memorandum of decision, the trial court found that the value of

the companies had been reduced as a result of the plaintiff's actions from $11,747,660 in June, 2011, to $6,336,734. Id. The court issued new orders, which were "in lieu of and replace[d] all of the orders in the original memorandum of decision regarding ownership of Pentalpha and payment therefor." The court then ordered the defendant to execute a promissory note in the amount of $3 million, which was one half of the sum ordered in the original dissolution judgment.[12] The court issued a new judgment dated February 25, 2014.

Both parties filed appeals. On August 17, 2012, the defendant filed his appeal[13] (AC 34936) from the dissolution judgment and the court's August 1, 2012 denial of his May 29, 2012 motions to open the judgment and to reargue. *Callahan* v. *Callahan*, supra, 157 Conn. App. 84 n.8. On March 7, 2014, the plaintiff filed her appeal (AC 36617) from the court's decision opening the dissolution judgment and modifying the financial orders. Id., 87. On April 7, 2014, the defendant amended his appeal to include a challenge to the court's opening of the judgment and its modification of the financial orders. Id. Although this court did not consolidate the appeals, it wrote one opinion addressing the claims made in both appeals. Id., 80 n.1.

In a decision released on May 5, 2015, this court "agree[d] with the plaintiff's claim that the court did not have authority to open the dissolution judgment and, accordingly, reverse[d] the judgment entering substitute financial orders and remand[ed] the case with direction to reinstate the May, 2012 financial orders." Id., 81. This court "otherwise affirm[ed] the dissolution judgment." Id. The rescript provided: "The judgment granting the motion to open is reversed and the case is remanded with direction to reinstate the May, 2012 financial orders. The judgment is affirmed in all other respects." Id., 101. The defendant filed two petitions for certification to appeal to our Supreme Court, which denied the petitions on June 24, 2015. *Callahan* v. *Callahan*, 317 Conn. 913, 116 A.3d 812 (2015); *Callahan* v. *Callahan*, 317 Conn. 914, 116 A.3d 813 (2015).

Following this court's resolution of the parties' prior appeals, the plaintiff filed, among other motions, a motion for contempt dated July 6, 2015. In her motion, she argued, inter alia, that the defendant had refused to comply with the judgment in that he had failed to pay the amounts set forth in the financial orders, plus interest, which she contended had begun accruing in 2012.[14] The parties appeared before the court, *Hon. Michael E. Shay*, judge trial referee, on this and other motions on November 24, 2015. During that appearance, the subject of the effective date of the judgment arose, and the court requested briefing. The parties appeared for argument on the issue on April 22, 2016.

On May 4, 2016, Judge Shay issued a memorandum of decision, in which he concluded that "the effective

date for the running of interest is September 8, 2015." The court set forth the sole issue of the parties as "whether 5 [percent] interest should be calculated from June 1, 2012, as set forth in the original judgment or from May 5, 2015, at the earliest, or at a date following the termination of the appellate process, at the latest." The court stated that counsel for the plaintiff had conceded during argument that the plaintiff's obligation to transfer the stock and the defendant's obligation to prepare the promissory note were not triggered until the appellate process terminated in 2015. Thus, the court found that "[i]n the absence of the obligation to draft a promissory note until after the appellate process was complete . . . it is only logical that interest would start to run from the later date." The court relied on case law providing that "the granting of a motion to open renders a trial court's judgment nonfinal and, therefore, ineffective pending its resolution"; *RAL Management, Inc.* v. *Valley View Associates*, 278 Conn. 672, 686, 899 A.2d 586 (2006); and that "[s]etting aside or vacating a prior order renders the situation the same as though the order had never been made"; *State* v. *Phillips*, 166 Conn. 642, 646, 353 A.2d 706 (1974); and concluded that "where the Appellate Court breathed new life into the then defunct original judgment, its provisions should become effective as of that date, and in this case, when the appellate process was at an end."[15]

We begin by setting forth the standard of review applicable to the claim that the court improperly construed this court's remand order as to the effective date of the judgment directed. "Determining the scope of a remand is a matter of law because it requires the trial court to undertake a legal interpretation of the higher court's mandate in light of that court's analysis. . . . Because a mandate defines the trial court's authority to proceed with the case on remand, determining the scope of a remand is akin to determining subject matter jurisdiction. . . . We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary. . . .

"At the outset, we note that, [i]f a judgment is set aside on appeal, its effect is destroyed and the parties are in the same condition as before it was rendered. . . . As a result, [w]ell established principles govern further proceedings after a remand by this court. In carrying out a mandate of this court, the trial court is limited to the specific direction of the mandate as interpreted *in light of the opinion*. . . . This is the guiding principle that the trial court must observe. . . . It is the duty of the trial court on remand to comply strictly with the mandate of the appellate court according to its true intent and meaning. . . . The trial court should examine the mandate and *the opinion of the reviewing court and proceed in conformity with the views expressed therein*." (Citations omitted;

emphasis in original; internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 383–84, 3 A.3d 892 (2010); see also *Bruno* v. *Bruno*, 177 Conn. App. 599, 606–607, 176 A.3d 104 (2017).

Both parties rely on the general principle that "[i]f the trial court's judgment is sustained, or the appeal dismissed, the final judgment ordinarily is that of the trial court. If, however, there is reversible error, the final judgment is that of the appellate court." *Preisner* v. *Aetna Casualty & Surety Co.*, 203 Conn. 407, 415, 525 A.2d 83 (1987); see also W. Horton & K. Bartschi, Connecticut Practice Series: Connecticut Rules of Appellate Procedure (2018–2019 Ed.) § 71-1, p. 258, authors' comments ("[i]f the Superior Court judgment is affirmed, the judgment is effective retroactive to the date of its entry; if a Superior Court judgment is reversed and a different judgment is directed by the Supreme Court, it is effective as of the date of the appellate judgment"). They disagree, however, as to the proper application of this principle. The plaintiff contends that "[t]he operative Superior Court judgment to determine the effective date is the May, 2012 judgment, which was affirmed, not [the February, 2014 decision], which impermissibly opened [the May, 2012 dissolution judgment] and which this court determined was a legal nullity." According to the defendant, however, the dissolution judgment was no longer in effect as of the court's November 6, 2012 decision opening the judgment. See *Connecticut National Bank* v. *Great Neck Development Co.*, 215 Conn. 143, 147, 574 A.2d 1298 (1990) ("[a]fter a motion for opening a judgment is granted, the case stands as though no judgment was rendered" [internal quotation marks omitted]). He contends that the judgment issued on February 25, 2014, remained in effect until this court released its decision in May, 2015. In that decision, this court *reversed* the February, 2014 judgment and, thus, he argues that the effect of the reversal is that the judgment directed by this court became effective upon the release of this court's decision.

We agree with the defendant that, under the unique procedural posture of this case, this court's decision and remand order disposing of the parties' prior appeals constituted a reversal of a judgment, which commands a new effective date, rather than an affirmance of a judgment, which would operate retroactively. Because the original financial orders were superseded by those contained in the court's intervening judgment, and that intervening judgment was reversed by this court, the judgment subsequently directed, which mandated a reinstatement of the superseded financial orders, was not effective retroactively.

The plaintiff argues, however, that the intervening decision constituted "a legal nullity" and that "[b]ecause the trial court lacked authority to open the judgment in

the first instance, that opened judgment cannot possibly provide authority to the trial court . . . to change the terms and effective date of the original May, 2012 judgment."[16] In support of her argument, she cites *RAL Management, Inc.* v. *Valley View Associates*, supra, 278 Conn. 684. In that case, our Supreme Court concluded that the trial court improperly opened the judgment of foreclosure and set new law days, in an action our Supreme Court described as "either a legal nullity or an action in contravention to the appellate stay barring actions to carry out or to enforce the judgment pending appeal." Id., 685. Accordingly, our Supreme Court concluded that the defendants' appeal "was not vitiated by the opening of the judgment." Id., 682. We find this case distinguishable, in that the issue presented in *RAL Management, Inc.*, was whether a pending appeal becomes moot when a trial court grants a motion to open a judgment of foreclosure to set new law days. Our Supreme Court recognized that the law days in a judgment of strict foreclosure have no legal effect pending the stay occasioned by an appeal because to give them legal effect "would result in the extinguishment of the right of redemption pending appeal." Id., 683. Thus, the court stated that "[i]t necessarily follows . . . that, if the law days have no legal effect and necessarily will lapse pending the appeal . . . any change to those dates pending appeal similarly [has] no effect." (Citation omitted.) Id., 684. In the present case, the court, in opening the dissolution judgment, did not modify a provision of the judgment that already lacked legal effect but, rather, set aside significant provisions of the financial orders contained in the dissolution judgment. Thus, we do not read *RAL Management, Inc.*, as suggesting that the court's opening of the judgment in the present case must be viewed as a legal nullity such that reversal of that decision would not warrant a new effective date of the judgment directed following reversal.

Moreover, our review of this court's opinion and its remand order leads us to conclude that this court did not order the reinstatement of the original judgment retroactive to May, 2012. See *Hurley* v. *Heart Physicians, P.C.*, supra, 298 Conn. 384 (in carrying out mandate of this court, trial court should "examine the mandate and the opinion of the reviewing court and proceed in conformity with the views expressed therein" [emphasis omitted; internal quotation marks omitted]). In this court's opinion, which disposed of two separate appeals, we concluded that the trial court lacked authority to open the judgment of dissolution and enter substitute financial orders on the basis of its finding that the plaintiff's postjudgment misconduct had reduced the value of the companies. *Callahan* v. *Callahan*, supra, 157 Conn. App. 91. In reciting the facts and procedural history, this court described the relevant May, 2012 orders as follows: "The court ordered

that the plaintiff transfer to the defendant all of her right, title, and interest to the companies within sixty days. Coincident therewith, the court ordered the defendant to sign a promissory note secured by the stock and accounts of the companies for $6 million payable to the plaintiff, at the rate of $1 million per year for six years. The order further provided that, if the defendant elected to sell the companies within six months, then he was to pay the plaintiff 55 percent of the sale proceeds, and the plaintiff was to receive no less than $4 million from the sale."[17] Id., 82–83.

This court's recitation of the orders it ultimately directed the trial court to reinstate suggests that it did not intend for the reinstatement to be effective as of May, 2012. First, it referenced the amount and schedule of the payments without reference to the dates set forth within that provision. Moreover, it noted that the defendant's obligation to sign the promissory note was coincident with the plaintiff's obligation to transfer the stock in the companies. A conclusion that the financial orders were effective retroactively would ignore the plaintiff's coincident obligation, which remains outstanding. See part V of this opinion. Last, this court referenced the defendant's option to sell the companies and pay the plaintiff for her interest in an alternative manner. To conclude that the judgment was effective retroactively would deprive the defendant of the opportunity to take advantage of that option and pay the plaintiff as set forth in paragraph 11 (a) of the dissolution judgment.[18] See footnote 11 of this opinion.

We also look to the rescript in this court's opinion, which provides: "The judgment granting the motion to open is reversed and the case is remanded with direction to reinstate the May, 2012 financial orders. The judgment is affirmed in all other respects." Id., 101. Construing the remand order; see *Barlow* v. *Commissioner of Correction*, 328 Conn. 610, 612–13, 182 A.3d 78 (2018) (appellate court has authority to interpret its own rescript); we conclude that it is not reasonable to interpret the direction to "reinstate" the May, 2012 financial orders as an instruction to the trial court to reinstate the orders retroactively to May, 2012. See *Connecticut National Bank* v. *Great Neck Development Co.*, supra, 215 Conn. 147 (stating, in context of determining whether motion to set aside judgment of dismissal was filed within four month period, that "[e]ven had the original judgment been *reinstated*, its effective date would have been November 1, 1988, and not the date it was first rendered" [emphasis added]). We think that had this court intended to direct the trial court to reinstate the May, 2012 financial orders retroactively to the date of the original judgment of dissolution, it would have included additional language, either in the body of the opinion or in its remand order, directing the trial court accordingly. See *Gary Excavating Co.* v. *North Haven*, 163 Conn. 428, 430, 311 A.2d 90 (1972) ("[n]o

judgment other than that directed or permitted by the reviewing court may be rendered, even though it may be one that the appellate court might have directed" [internal quotation marks omitted]). The date May, 2012, was employed to identify which financial orders were reinstated.

The plaintiff argues that "[l]ike other postjudgment interest cases, the accrued interest provision in the May, 2012 orders was meant to compensate [her] for 'the loss of the use of the money that . . . she is awarded from the time of the award until the award is paid in full,' " citing a case involving the application of General Statutes § 37-3a, *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 310 Conn. 38, 55, 74 A.3d 1212 (2013). "A trial court must make two determinations when awarding compensatory interest under § 37-3a: (1) whether the party against whom interest is sought has wrongfully detained money due the other party; and (2) the date upon which the wrongful detention began in order to determine the time from which interest should be calculated." (Internal quotation marks omitted.) *Marshall* v. *Marshall*, 151 Conn. App. 638, 653, 97 A.3d 1 (2014); see also *Sosin* v. *Sosin*, 300 Conn. 205, 245, 14 A.3d 307 (2011) (trial court did not abuse discretion under § 37-3a in ordering interest from September 8, 2005, and it must be assumed that trial court determined that, until that time, plaintiff's retention of money was not entirely unjustified); *Bruno* v. *Bruno*, supra, 177 Conn. App. 611, 613–14 (where 2008 dissolution judgment awarded defendant certain assets in Charles Schwab account, and appellate court subsequently found error in trial court's postjudgment valuation of account, trial court on remand did not abuse its discretion in awarding postjudgment interest on amount due from that account from September 30, 2014, which was date on which trial court on remand established value of that account).

Although the present case does not involve statutory interest, it is worth noting that § 37-3a "authorizes an award of interest in civil actions . . . as damages for the detention of money *after it becomes payable*." (Emphasis added.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, supra, 310 Conn. 43 n.8. In the present case, the sums set forth in the dissolution's financial orders were no longer payable once the court opened the dissolution judgment and, therefore, the plaintiff's argument that she should be compensated for the loss of use of that money is without foundation.

Accordingly, we conclude that the trial court properly interpreted this court's mandate in determining the effective date of the judgment.

V

The plaintiff next claims that the court erred in ordering her to execute certain documents to transfer her

interest in the companies, as contemplated by the dissolution judgment. She argues broadly that the "complex commercial document[s]" prepared by the defendant were inconsistent with the dissolution judgment's requirement that she "transfer" her interest. Specifically, she argues that the defendant's proposed documents were improper in three main respects.[19] First, she challenges the inclusion of a general release, which she contends was not required by the May, 2012 financial orders. Second, she argues that the documents require the plaintiff to make representations and warranties that she cannot make on the basis of her personal knowledge. Third, she emphasizes the difference between a "transfer" of her interest, which the dissolution court ordered, and a "sale" of her interest, which she contends was not contemplated by the dissolution judgment. She argues that "there was no language in the property orders that indicates the companies should be sold at fair market value." We disagree that the court acted outside of its authority to issue postjudgment orders effectuating the dissolution judgment.

The following additional facts and procedural history are relevant to this claim. As noted previously, paragraph 11 of the May, 2012 dissolution judgment required the plaintiff to transfer to the defendant "all of her right, title and interest to the Pentalpha companies" within sixty days. Coincident with the transfer, the defendant was required to sign a promissory note secured by the stock and accounts of the companies in the amount of $6 million.[20] See part IV of this opinion. Following this court's decision resolving the parties' prior appeals, the defendant, in October, 2015, provided the plaintiff with a proposed document to effectuate the transfer of her interest. The plaintiff thereafter filed a motion for contempt, in which she argued that the defendant had wilfully failed to provide her with the promissory note within the time frame required and that "the defendant has acted in bad faith by submitting an onerous document beyond the scope of the judgment." Specifically, she argued that the draft document improperly required her to "make representations and disclosures about the Pentalpha companies that she is [in] no position to make since she has not been actively working at the company since 2009."

The court heard the contempt motion on April 10, 2018. The plaintiff presented no witnesses, as her counsel took the position that no testimony was required. He maintained that the court could decide the motion on the basis of both parties' proposed transfer documents, which had been entered into evidence. The defendant presented the testimony of Attorney William Perrone, who was qualified as an expert in the area of business transactions. Perrone testified regarding the type of legal documents necessary to effectuate the sale of a company. The plaintiff's counsel objected to Perrone's testimony on the ground that the dissolution judgment

required a transfer of the plaintiff's interest, not a sale. The court overruled the objection, and Perrone testified that the terms transfer and sale are synonymous. Specifically, he testified: "[I]n corporate parlance, transfer and sale are used interchangeably. Quitclaim, which is a term that is more prevalent in real estate, is also used outside of the real estate world to denote a transaction in which an asset is transferred but there's no . . . backup. It's basically what I have—literally what I have, you have. You have no representations. You have no warranties. You have no indemnification, no protection."

Perrone testified that buyers look to representations and warranties to determine the value of the transaction. He further opined that the sale of a business that operates in a regulated industry, such as the present companies, requires more fulsome representations and warranties, which he stated "essentially make the seller stand behind everything from compliance with laws, to observation of rules regarding data privacy, to the accuracy of financial statements, to whether or not there [are] any environmental issues."

Perrone reviewed each party's proposed transfer documents. The document prepared by the defendant's counsel, dated October 27, 2015, and titled "Agreement Under Section 11 of Order dated May 8, 2012," was entered into evidence as the defendant's exhibit D. Perrone opined that exhibit D contained standard representations and warranties for a transaction of this size and that it would permit the defendant to transfer the companies at fair market value. The documents prepared by the plaintiff's counsel, including a promissory note, assignment, and pledge and security agreement, were entered into evidence as the defendant's exhibit E.[21] Perrone testified that exhibit E contained no representations or warranties, and that the lack thereof would adversely impact the value of the companies as held by the defendant or to a potential third party buyer. On cross-examination, the plaintiff's counsel asked Perrone to identify the provision of the dissolution judgment that ensured that the defendant could sell the companies at fair market value. Perrone responded that the provisions setting forth the valuation of the companies and permitting the defendant to sell the companies, when read together, implicitly contemplate that the defendant should have the opportunity to sell the companies at fair market value.

As to the specific terms of the defendant's proposed transfer documents, Perrone acknowledged that certain provisions contained in exhibit D required amendment because they were inconsistent with the dissolution judgment, in that they purported to transfer the plaintiff's interest "free and clear of any pledge, security interest, lien, charge or other encumbrance . . . ." Perrone testified that the document required "a carve out

. . . for the discrete lien that is called for by the order." With respect to the release contained in exhibit D, Perrone testified that "[i]t's customary when shareholders are exiting a business that they . . . execute and deliver a release, and the reason for that is that you make your deal and you pay somebody for their shares; you don't want them coming back after the fact and saying, well, yeah, about that dividend, about this, about that, what about this money that I was owed. You want a clean break when someone sells." He stated that a release is "common in this context" and opined that with the same carve out for obligations that were owed under the note, the release would be acceptable.

In closing argument, the plaintiff's counsel asked the court, in the event it declined to find the defendant in contempt, to order him to execute the plaintiff's proposed documents, which the plaintiff contended conformed to the dissolution judgment. In its oral ruling, the court found the relevant provisions of the judgment, namely, paragraph 11 requiring transfer of the plaintiff's interest and paragraph 17 requiring the execution of all documents necessary to effectuate the orders within thirty days, to be clear and unambiguous. The court credited Perrone's testimony and noted that paragraph 17 contemplates other documents that would not specifically be mentioned in the judgment. Finding a failure to comply with the court's order to sign a promissory note but that such failure was not wilful, the court declined to find the defendant in contempt. The court then issued the following remedial order: "In order to effectuate these orders, and the court finds the word[s] transfer and sale as defined by [Perrone] to be interchangeable, the court finds that exhibit D, with the representations and warranties, is the normal and customary document to transfer these types of assets. However, the document as presented wasn't perfect, and counsel pointed out a few items regarding the security and paragraph 4.4,[22] [and] some of the language on page thirty eight.[23]

"So, the court finds that exhibit D is normal and customary for these types of transactions, and is issuing a remedial order ordering the plaintiff to execute the documents in the line of exhibit D as amended with a few of the items.

"Now, there may be a few other items that weren't picked up through [Perrone's] examination, and I don't expect that to be an exhaustive list of other things that might have been just overlooked because I don't think the details have been strictly negotiated by the parties. So, the court will use that as a guideline, including the general release, all the documents as provided.

"And the court's going to reserve jurisdiction over this. I do not believe that this is an additional order. This is to effectuate the order of Judge Munro from [the May, 2012 dissolution judgment]." (Footnotes

added.) At the parties' request, the court ordered the plaintiff's counsel, within ten days, to review the documents and provide comments to the defendant's counsel, who would then have ten days to respond, and the parties could then return to court for resolution of any remaining issues.

We begin by setting forth the standard governing our review of the court's order regarding the transfer documents. "Although the court does not have the authority to modify a property assignment, a court, after distributing property, which includes assigning the debts and liabilities of the parties, does have the authority to issue postjudgment orders effectuating its judgment. . . . [I]f the . . . motion . . . can fairly be construed as seeking an effectuation of the judgment rather than a modification of the terms of the property settlement, this court must favor that interpretation." (Internal quotation marks omitted.) *O'Halpin* v. *O'Halpin*, 144 Conn. App. 671, 677–78, 74 A.3d 465, cert. denied, 310 Conn. 952, 81 A.3d 1180 (2013). "A modification is [a] change; an alteration or amendment which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact. . . . In contrast, an order effectuating an existing judgment allows the court to protect the integrity of its original ruling by ensuring the parties' timely compliance therewith." (Internal quotation marks omitted.) Id., 677.

"In order to determine the practical effect of the court's order on the original judgment, we must examine the terms of the original judgment as well as the subsequent order." *Stechel* v. *Foster*, 125 Conn. App. 441, 447, 8 A.3d 545 (2010), cert. denied, 300 Conn. 904, 12 A.3d 572 (2011). "Because [t]he construction of a judgment is a question of law for the court . . . our review of the . . . claim is plenary. As a general rule, judgments are to be construed in the same fashion as other written instruments. . . . The determinative factor is the intention of the court as gathered from all parts of the judgment. . . . The interpretation of a judgment may involve the circumstances surrounding the making of the judgment. . . . Effect must be given to that which is clearly implied as well as to that which is expressed. . . . The judgment should admit of a consistent construction as a whole." (Internal quotation marks omitted.) *Perry* v. *Perry*, 156 Conn. App. 587, 593, 113 A.3d 132, cert. denied, 317 Conn. 906, 114 A.3d 1220 (2015).

Before turning to the specific provisions of exhibit D that the plaintiff finds objectionable, we first address the plaintiff's broader argument that the court erred in requiring her to execute a " 'negotiated' complex commercial document." In its remedial order regarding the transfer documents, the court found that a document of the type of exhibit D, including the representa-

tions and warranties and release contained therein, was required to transfer the plaintiff's interest in what the court described as "an asset that has significant value . . . ." In so finding, the court credited the testimony of Perrone, who opined that especially in the case of a regulated industry, a transfer of the plaintiff's interest would require fulsome representations and warranties in order to preserve the fair market value of the companies. Our review of the record indicates that the court's credibility determination was not clearly erroneous, and we thereby defer to the court's conclusion regarding the credibility of Perrone's testimony. See *Budrawich* v. *Budrawich*, 156 Conn. App. 628, 646, 115 A.3d 39, cert. denied, 317 Conn. 921, 118 A.3d 63 (2015).

As to whether the original judgment should be construed to require such a transfer, the plaintiff argues that "there was no language in the property orders that indicates the companies should be sold at fair market value." During the dissolution trial and first appeal, the disposition of the companies, which were valued collectively in excess of $10 million, was a central issue. Notably, both parties proposed that the companies be sold. *Callahan* v. *Callahan*, supra, 157 Conn. App. 98. Despite finding that "neither party wants the Pentalpha companies," the court ordered the plaintiff to transfer her interest in the companies to the defendant in exchange for the defendant's execution of a promissory note. Although the court declined to order a sale, its orders anticipated that the defendant might elect to sell the companies. In the event that he did sell the companies, the plaintiff was to receive no less than $4 million from the sale. Thus, both parties and the court envisaged a potential sale of the companies. As to whether the transfer documents should be drafted in order to permit a sale at fair market value, it is significant that the amount of the promissory note correlated with the valuation of the companies, in that the note in the amount of $6 million was to be exchanged for the plaintiff's 51 percent interest in the companies valued at $11,747,660. Accordingly, we do not find persuasive the plaintiff's argument premised on the absence of language expressly contemplating a sale at fair market value. Indeed, it would be inconsistent with the distribution of the parties' assets to allow the plaintiff to transfer her interest by way of a document that effected a significant reduction in the value of the companies. Thus, we construe the judgment as requiring a transfer of her interest in a manner that preserves the fair market value of the companies.

Having concluded generally that a document of the type and breadth of exhibit D is required to effectively transfer the plaintiff's interest, we turn to the plaintiff's challenges to the specific provisions of that document. She argues that a general release was not required by the May, 2012 financial orders.[24] Perrone testified that the release provided in exhibit D was customary in the

context of a shareholder exiting a business and that the purpose of a release in that context is to ensure a "clean break" and provide assurance against future claims alleging unpaid dividends or other sums owed. The plaintiff presented no evidence to refute Perrone's testimony that such a release was customary. We conclude that the inclusion of a release in the transfer documents did not constitute a modification of the dissolution judgment.

With respect to the plaintiff's broadly stated concern that she was unable to make certain representations because she had been "absent from running the company since 2009," she relied solely on the court's finding in the judgment of dissolution that "[t]he plaintiff's full and final resignation from actual work . . . occurred in September, 2009."[25] Aside from repeating that finding, the plaintiff presented no evidence to demonstrate her inability to make particular representations. Although the plaintiff declined to call any witnesses during the hearing, she had the opportunity to challenge specific provisions through her counsel's examination of Perrone.

As to inconsistencies she identified during the hearing, the trial court expressly acknowledged such provisions as requiring amendment prior to execution of the transfer documents. For example, the transcript reveals that the plaintiff's counsel questioned Perrone regarding paragraph 4.4, which provided: "No Undisclosed Liabilities. The Company is not subject to any liability (including unasserted claims, whether known or unknown), whether absolute, contingent, accrued or otherwise, that is not shown or that is in excess of amounts shown or reserved for in the Financial Statements, other than liabilities of the same nature as those set forth in the Financial Statements and reasonably incurred in the ordinary course of business after the Financial Statements Date, whether or not material." Perrone agreed that paragraph 4.4 was not necessary, and the court's order expressly identified that provision as one requiring amendment prior to the plaintiff's execution. Although the plaintiff provides examples in her supplemental appellate brief of representations and warranties she finds objectionable, our review of the record reveals that she neither set forth the particular provisions in her motion for contempt, nor identified these provisions to the trial court during the hearing. Thus, we need not address these arguments. See *Histen* v. *Histen*, 98 Conn. App. 729, 737, 911 A.2d 348 (2006) (argument need not be addressed because plaintiff never made it in proceedings before trial court).

"[I]t is within the equitable powers of the trial court to fashion whatever orders [are] required to protect the integrity of [its original] judgment." (Internal quotation marks omitted.) *Fewtrell* v. *Fewtrell*, 87 Conn. App. 526, 531 n.4, 865 A.2d 1240 (2005). We conclude that the

court's order requiring the plaintiff to execute the defendant's proposed transfer documents, as amended to correct inconsistencies identified during the hearing, effectuated rather than modified the existing judgment of dissolution.

## VI

The plaintiff's last claim on appeal is that the court improperly concluded that it lacked subject matter jurisdiction to require the defendant to endorse two insurance checks totaling $440,370.58. Specifically, she argues that the court's failure to issue an order compelling the defendant to endorse the checks, which were issued following postdissolution property damage to the former marital home, was tantamount to an impermissible modification of the original property division, in that the plaintiff was deprived of the full value of the home. She argues that an order requiring the defendant to endorse the checks is necessary to effectuate and preserve the dissolution judgment.[26] The defendant responds that the court correctly determined that it lacked authority to distribute the insurance proceeds because the funds were acquired after the dissolution of the marriage and "family courts do not have the authority to make postjudgment property distribution awards or to adjudicate postjudgment tort or contract claims between two divorced persons relating to new assets." We conclude that the court lacked authority to enter an order with respect to the checks.

The following additional procedural history is relevant to this claim. On March 28, 2017, the plaintiff filed a motion requesting that the court order the defendant to endorse two Chubb property damage insurance checks totaling $440,370.58. In her motion, she represented the following facts. The defendant had occupied the former marital home following the dissolution until October 9, 2015. After he vacated the home, the insurance policy issued by Chubb remained in both his and the plaintiff's names, and he continued to make premium payments from October 9, 2015 through March 24, 2017. His name also remained on the mortgage for the property. At some point after he vacated the property on October 9, 2015, the pipes burst. The plaintiff filed an insurance claim for the resulting damage. In her motion requesting that the court order the defendant to endorse the checks, she stated: "Chubb appraised the damage and issued the first set of insurance damage checks in June, 2016 ($163,429.42 and $276,941.16). A second replacement set of checks was issued approximately one month later to include James Callahan. The checks are made out to [the] parties, and one check includes Citibank Mortgage." The defendant refused to endorse the checks, preventing the plaintiff from receiving the proceeds to repair the damage to the home.

On March 31, 2017, the defendant filed an objection,

in which he argued that the plaintiff's request that the court adjudicate ownership rights to the checks issued relating to damage that occurred following the dissolution of the parties' marriage was improper. He contended that the court lacked authority "to adjudicate postjudgment disputes relating to the diminished value of property awarded to one of the spouses." On March 14, 2018, the plaintiff filed a memorandum of law in support of her motion. In her memorandum, she argued that an order requiring the defendant to endorse the checks was necessary to effectuate the provision of the dissolution judgment that awarded the former marital home to the plaintiff.[27] She further directed the court's attention to paragraph 17 of the May, 2012 dissolution judgment, which provides: "Both parties shall execute all necessary documents for the effectuation of these orders within thirty (30) days, unless other specific times are already provided herein."

On April 3, 2018, the court, *Diana, J.*, heard the plaintiff's motion. After argument, the court issued an oral ruling denying the motion. It stated: "I've considered the statutory breakdown of what's an asset, listened to your arguments, and reviewed the motions. The court finds this is an after-acquired asset, and it does not have jurisdiction to address this matter under [§] 46b-81."[28]

We begin with our standard of review. The plaintiff's claim implicates the scope of the court's authority to act postdissolution with respect to the dispute over the insurance checks. "Any determination regarding the scope of a court's . . . authority to act presents a question of law over which our review is plenary." (Internal quotation marks omitted.) *McLoughlin* v. *McLoughlin*, 157 Conn. App. 568, 578, 118 A.3d 64 (2015).

"It is well settled that [c]ourts have no inherent power to transfer property from one spouse to another; instead, that power must rest upon an enabling statute. . . . The court's authority to transfer property [in] a dissolution proceeding rests on [General Statutes] § 46b-81. That section provides in relevant part: *At the time of entering a decree . . . dissolving a marriage . . . the Superior Court may assign to either the husband or wife all or any part of the estate of the other . . . .* Accordingly, the court's authority to divide the personal property of the parties, pursuant to § 46b-81, must be exercised, if at all, at the time that it renders judgment dissolving the marriage." (Emphasis in original; internal quotation marks omitted.) Id., 578–79.

In support of her argument that the court had authority to order the defendant to endorse the checks as an effectuation of the dissolution judgment, the plaintiff cites *Cifaldi* v. *Cifaldi*, 118 Conn. App. 325, 983 A.2d 293 (2009). In that case, the parties entered into a separation agreement, the terms of which were incorporated into the dissolution judgment. Id., 327. Pursuant to that agreement, the parties agreed to have qualified domes-

tic relations orders (QDROs)[29] prepared to divide the defendant's two pensions. Id. At the time the defendant retired, the QDROs had not yet been processed by either pension plan administrator. Id., 328–29. The defendant went into pay status with respect to his pensions, and his payments included the portions of the pensions that had been assigned to the plaintiff. Id. The plaintiff sought an order of the court requiring the defendant to reimburse her portion of his pension benefits, which the court declined to issue. Id., 329–30. On appeal, this court concluded that the trial court improperly declined to issue the requested order because such order was necessary to effectuate the judgment. Id., 330.

"[W]hen a party has been denied marital property to which the party is entitled as part of the allocation of property pursuant to a judgment of dissolution of marriage, and the aggrieved party seeks relief from the court, the court is under an affirmative obligation to issue financial orders effectuating the existing allocation of marital property to protect the integrity of the original judgment, subject to equitable defenses. To hold otherwise would allow a court to modify a property distribution simply by its own silence or inaction." Id., 334. We conclude that *Cifaldi* is distinguishable from the present case, in that the judgment in *Cifaldi* afforded the plaintiff a property interest in portions of the defendant's pension benefits, and she never received this asset. Thus, the provision of the dissolution judgment at issue had not been effectuated. In contrast, the plaintiff in the present case received the asset awarded to her by the dissolution provision at issue. The plaintiff does not dispute that she both owned, and was in possession of, the home at the time the damage occurred and the checks were issued.

She argues, however, that the proceeds from the insurance checks should be "used as intended, i.e., to protect the integrity of the original judgment, including the value of the marital home," which, according to the plaintiff, was reduced by $440,370.58 due to the defendant's failure to endorse the checks. The defendant responds that even if the damage was regarded as causing a postjudgment change affecting the value of the home, this court, in its prior decision in this matter, rejected the argument that the court could revisit the judgment on a similar basis. The defendant points to this court's recognition in the parties' prior appeals that "neither § 46b-81 nor any other closely related statute vests the trial court with authority to revisit a judgment dividing marital property where postjudgment conduct, conditions, or changes affect the value of a marital asset." *Callahan* v. *Callahan*, supra, 157 Conn. App. 92. The defendant further argues that *Buehler* v. *Buehler*, 138 Conn. App. 63, 66, 50 A.3d 372 (2012), controls. In that case, the trial court entered orders at the time of dissolution relating to the marital home, including that the home be sold. Id. In postjudg-

ment orders, the court permitted the home to be rented and awarded the defendant the rental income generated by the home. Id., 71. On appeal, this court determined that the court acted without authority in assigning the rental income wholly to the defendant, as such order constituted an improper postjudgment property assignment in violation of § 46b-86 (a). Id.

In the present case, the court in its May, 2012 dissolution judgment awarded the plaintiff the former marital home and that distribution was effectuated when ownership vested in the plaintiff. Subsequent to the effectuation of the judgment, damage to the home caused a change in its value. Under these circumstances, the trial court lacked authority to revisit its property distribution orders or enter additional property distribution orders to compensate the plaintiff for the alleged postjudgment reduction in value of the home. See *Callahan* v. *Callahan*, supra, 157 Conn. App. 89 (stating general rule that "[t]he court's authority to distribute the personal property of the parties must be exercised, if at all, at the time that it renders judgment dissolving the marriage" [internal quotation marks omitted]). Moreover, to the extent the proceeds of the insurance checks are viewed not as a reflection of the reduction in value of the home but rather as a new asset acquired pursuant to a contract of insurance in effect after the parties' marriage had been dissolved, such proceeds would not be marital property distributable under § 46b-81. See *Reinke* v. *Sing*, 328 Conn. 376, 381 n.3, 179 A.3d 769 (2018) ("[t]he purpose of a property division pursuant to a dissolution proceeding is to unscramble existing marital property in order to give each spouse his or her equitable share at the time of dissolution" [internal quotation marks omitted]); *Wood* v. *Wood*, 160 Conn. App. 708, 716, 125 A.3d 1040 (2015) ("the marital estate divisible pursuant to § 46b-81 refers to interests already acquired, not to expected or unvested interests, or to interests that the court has not quantified" [internal quotation marks omitted]).

We therefore conclude that the court lacked authority under § 46b-81 to issue postjudgment orders regarding the insurance checks.

The plaintiff's appeal regarding the suspension of alimony payments is dismissed as moot. The judgments are affirmed in all other respects.

In this opinion the other judges concurred.

[1] With respect to the plaintiff's sixth claim, although the court used the term "jurisdiction," we note that the postdissolution distribution of property does not implicate the court's subject matter jurisdiction but, rather, its statutory authority. See *Reinke* v. *Sing*, 328 Conn. 376, 391–92, 179 A.3d 769 (2018) (General Statutes § 46b-86 [a] does not deprive trial court of subject matter jurisdiction to modify property distribution order).

[2] See footnote 1 of this opinion.

[3] In one sentence in each of her principal and reply briefs, the plaintiff maintains that "the trial court would not allow the plaintiff to present expert testimony on the absence of any substantial change in the defendant's earning capacity independent of Pentalpha." The plaintiff provides no cita-

tion to authority or analysis as to any argument that the court improperly precluded expert testimony. Accordingly, to the extent she seeks to challenge the court's preclusion of expert testimony, that issue is inadequately briefed, and we decline to address it. See *Gorski* v. *McIsaac*, 156 Conn. App. 195, 209, 112 A.3d 201 (2015) ("We are not obligated to consider issues that are not adequately briefed. . . . Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived. . . . In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice." [Internal quotation marks omitted.]).

[4] The plaintiff suggests, without citation to any authority, that this claim should be afforded plenary review. We disagree.

[5] The court, in its May, 2012 dissolution judgment, stated that its "alimony order is predicated on earnings, including member distributions to the defendant of up to $2 million per year." It further stated that "[f]inding earnings attributable to the defendant in the amount of $2 million gross is conservative, [and] the court adopts it as a finding of fact as to the present earning capacity of the defendant at Pentalpha." In support of that finding, the court noted that "the plaintiff's valuation expert, Barry Sziklay, concluded that a comparable compensation for the defendant, as the key person operating on Wall Street, would be at least in the [$1 million to 2] million range annually." On appeal, this court reiterated these findings. *Callahan* v. *Callahan*, supra, 157 Conn. App. 97.

In the present appeal, the plaintiff asks this court to find error in the trial court's tying the defendant's earning capacity to his full-time employment at the companies. In making this argument, the plaintiff urges this court to require the trial court to establish the defendant's earning capacity on the basis of his pre-1995 employment. We find no error in the trial court's decision to refrain from doing so.

[6] During oral argument before this court, the plaintiff's counsel argued that the plaintiff experienced an injury at the time of the suspension, but recognized that were this court to uphold the alimony modification, the plaintiff's claim of error in the suspension of the alimony payments would be rendered moot.

[7] We note that the record reveals other occurrences on which the plaintiff's counsel did not attend scheduled court hearings.

[8] In an ex parte emergency motion dated April 27, 2017, the plaintiff requested immediate reinstatement of her monthly alimony payments retroactive to April 1, 2017. She represented that she was available to return to court to attend the trial and that she had requested the earliest available trial dates. The court denied the motion and indicated that it would address the matter at the next scheduled hearing date. The parties appeared before the court on May 12, 2017, on which date the plaintiff was present. The court found that there was "nothing substantial that has changed" and declined to change its order.

[9] Specifically, the court found "[t]hat the orders herein have created a substantial overpayment of periodic alimony by the defendant; that for the period July 1, 2014 through and including August 1, 2017, the defendant has paid the sum of $1,990,000 (33 months x $60,000 plus 1 month [at] $10,000); that for the period April, 2017 through June, 2017, payment of the defendant's alimony obligation was suspended; that after taking into account the new orders herein retroactive to July 1, 2014, the defendant's total alimony obligation since that date is $660,000 (18 months x $24,000 plus 19 months x $12,000); and that the overpayment of periodic alimony amounts to $1,330,000." (Emphasis omitted.) The court thereafter ordered the plaintiff to reimburse the defendant the amount of overpayment in installments.

[10] We note that the plaintiff makes no claim on appeal that the court erred in calculating the amount of the defendant's overpayment.

[11] Paragraph 11 continues: "a. If the defendant chooses to sell 100 percent interest in all of the Pentalpha companies within the next six months, then the defendant shall in full satisfaction of the note here above described pay her 55 percent of the proceeds of the sale, net of all sums necessary to pay upon sale, except any sums payable to the defendant, or for his benefit, for any reason. The defendant is entitled to a dollar for dollar setoff against that payment for all payments made to the plaintiff under this numbered order, so long as she receives no less than $4,000,000 from the sale. Otherwise, he is not entitled to any such setoff. No other terms of sale than those described herein shall trigger this section.

"b. If the plaintiff brings a civil action against the defendant and/or the Pentalpha companies for any rights or interests she perceives have been

violated, other than those provided for in these orders, and recovers any sums therefor, the defendant shall have a dollar for dollar right of setoff of said sums paid to the plaintiff against his obligations in this paragraph eleven."

[12] The replacement orders provided: "a. The plaintiff shall immediately (within ten [10] days) resign from all positions at the Pentalpha companies and execute a general release in favor of the defendant for all claims she has, or may have, for conduct arising out of the parties' management and ownership of the Pentalpha companies.

"b. The plaintiff shall also execute an agreement to provide such documentation as required [by] Pentalpha's attorneys from time to time, relating to any time period that she had an ownership interest in Pentalpha or held herself out as an officer, principal, a part of management or owner of Pentalpha. Upon her execution of this agreement, the defendant shall execute a note payable to the [plaintiff] in the amount of $3,000,000 payable as follows:

"i. $1,000,000 upon the conclusion to final judgment or withdrawal of the plaintiff's lawsuit against the auditor for all claims arising out of the auditors' work for the Pentalpha companies. The court conditions this payment upon this inasmuch as the lawsuit is a significant impediment to the smooth operation of the Pentalpha companies and their ability to borrow money (e.g., the typical need for a clean audit to borrow) so that the businesses can continue to operate with reduced income and support the ability of the defendant to pay this obligation;

"ii. $1,000,000 on the first annual anniversary of the first payment; and

"iii. $1,000,000 on the second such anniversary of the first payment.

"c. If the plaintiff refuses to cooperate with the signing of any document deemed necessary by a Pentalpha attorney in response to a particular inquiry, the defendant shall be excused from the next anniversary payment until and unless a court of competent jurisdiction determines that the plaintiff shall be excused from signing such requirement regarding the issue then at hand. Any overdue payments to the plaintiff as a result of this circumstance shall not accrue interest until and unless she is so excused by a final order of the court, in which case the interest shall accrue from 30 days after that final order.

"d. If the defendant fails to make payments in a timely manner (note the exception is subparagraph d above), they shall accrue interest, from their due date at the rate of 5 [percent] per annum, simple interest."

[13] Pending resolution of the defendant's appeal, execution of the financial orders regarding the companies was stayed. See Practice Book § 61-11 (a). The plaintiff filed a motion for termination of the stay of execution, which the court, *Munro, J.*, denied. See Practice Book § 61-11 (e). *Callahan* v. *Callahan*, supra, 157 Conn. App. 83.

[14] Specifically, she argued: "1. The defendant has failed to pay the plaintiff—$4,000,000, plus interest at 5 [percent] from June 1, 2012 (per [paragraph] 11 of the judgment) or 10 [percent] interest due to his default. This amount represents four of the six equal annual payments already due, together with the accrued interest at 5 [percent] from June 1, 2012, to date of payment on the total due of $6,000,000. Such accrued interest totals $972,146.80 to June 25, 2015. As payment has not been made as per judgment, the entire amount due of $6,000,000 and accrued interest is in default and will accrue interest at 10 [percent] from June 26, 2015 until such amount is paid (per [paragraph] 11 of the judgment at pages 23 and 23).

"2. The defendant has failed to execute a promissory note secured on the stock and accounts of the Pentalpha companies in the amount of the unpaid balance of the $6,000,000, plus all accrued interest at the 5 [percent] interest rate or default rate of 10 [percent] per year (per [paragraph] 11 of the judgment at page 24).

"3. The defendant has failed to pay the plaintiff $600,000, together with accrued interest at 5 [percent] from August 6, 2012 (per [paragraph] 12 of the judgment) to date of payment. Such accrued interest totals approximately $91,552.45 as of to date."

[15] This court granted the plaintiff's motion for permission to file a late second amended appeal from Judge Shay's May 4, 2016 decision. The plaintiff filed her amended appeal on October 5, 2018, and subsequently filed a supplemental brief on October 19, 2018.

[16] This court concluded that the trial court "exceeded the scope of its authority by opening the judgment to modify its financial orders based on the plaintiff's postjudgment misconduct." *Callahan* v. *Callahan*, supra, 157 Conn. App. 93.

[17] Subsequently in the opinion, this court similarly described the orders as follows: "On May 8, 2012, the court ordered that the plaintiff transfer to the defendant all of her rights, title, and interest to the companies. *In exchange*, the court ordered the defendant to sign a promissory note, secured by the stock and accounts of the companies, requiring him to pay the plaintiff $1 million per year for six years for her share in the companies. The order further provided that, if the defendant elected to sell the companies within six months from the dissolution judgment, then he was to pay the plaintiff 55 percent of the sale proceeds, and the plaintiff was to receive no less than $4 million from the sale." (Emphasis added.) *Callahan* v. *Callahan*, supra, 157 Conn. App. 98.

[18] The plaintiff argues that the court's decision as to the effective date of the judgment constituted an impermissible modification of the property distribution. The defendant responds that the decision was an effectuation of the trial court's orders, which, aside from setting forth payments to be made by the defendant, provided him with the option to sell or finance the companies to pay the plaintiff for her interests.

"A modification is [a] change; an alteration or amendment which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact. . . . In contrast, an order effectuating an existing judgment allows the court to protect the integrity of its original ruling by ensuring the parties' timely compliance therewith.

"Although the court does not have the authority to modify a property assignment, a court, after distributing property, which includes assigning the debts and liabilities of the parties, does have the authority to issue postjudgment orders effectuating its judgment. . . . [I]f the . . . motion . . . can fairly be construed as seeking an effectuation of the judgment rather than a modification of the terms of the property settlement, this court must favor that interpretation." (Internal quotation marks omitted.) *O'Halpin* v. *O'Halpin*, 144 Conn. App. 671, 677–78, 74 A.3d 465, cert. denied, 310 Conn. 952, 81 A.3d 1180 (2013).

We agree with the defendant that the determination of the judgment's effective date was necessary in order to implement the property distribution orders and that the court's order protected the integrity of, rather than modified, those orders.

[19] The plaintiff also maintains that the documents are improper in a fourth respect, in that the new promissory note delayed the accrual of interest for three years and reset the deadlines for payments on the note. Our resolution of the plaintiff's fourth claim is dispositive of this argument, which requires no further discussion here. See part IV of this opinion.

With respect to the proposed promissory note, she also argues that unlike the May, 2012 dissolution judgment, it improperly "forbids [the] plaintiff from transferring, bequeathing or otherwise disposing of the note in any way." Attorney William Perrone, who testified as an expert in the area of business transactions, recognized that the dissolution judgment by its express terms did not prohibit the plaintiff from bequeathing or transferring the note, but testified that "I think that it's not uncommon in a situation like this where the note—where the paper wouldn't be negotiable. Sometimes paper is personal because you don't want one party to discount this paper, sell the paper, and then have the other party be dealing with a party that they didn't know." The plaintiff presented no evidence to the contrary and we are not persuaded that the inclusion of a prohibition on transfer of the note constituted a modification of the dissolution judgment.

[20] We note that the court's April 17, 2019 memorandum of decision terminating the appellate stay of the court's April 10, 2018 decision indicated that the defendant had made payments to the plaintiff in the amount of $4 million.

[21] Perrone additionally had examined a document prepared by the plaintiff's prior counsel to effectuate the sale and opined that it was "essentially a quitclaim." Perrone opined that use of that document, which was titled "Promissory Note" and dated May 8, 2012, could reduce the sale price of the companies to a "fire sale" price due to the potential buyer accepting additional risk because of sparse representations and warranties.

[22] Paragraph 4.4 of exhibit D provided: "No Undisclosed Liabilities. The Company is not subject to any liability (including unasserted claims, whether known or unknown), whether absolute, contingent, accrued or otherwise, that is not shown or that is in excess of amounts shown or reserved for in the Financial Statements, other than liabilities of the same nature as those set forth in the Financial Statements and reasonably incurred in the ordinary course of business after the Financial Statements Date, whether or not

material."

The following colloquy occurred with respect to whether the plaintiff could make the warranty provided therein:

"The Court: In your opinion, can she make that even though she hasn't actively been involved in the business since [2009] and she's still the majority owner today? Does it matter?

"[The Witness]: I think—well, I think I could live—if I were negotiating this deal, right, I could live without 4.4 because 4.5 is sufficient to cover any activity since her resignation. Right? I mean that's the kind of thing I was talking about earlier today, about being able to say—

"[The Plaintiff's Counsel]: Okay. So, when you—when it was set forth in your disclosure of expert witness that the documents presented by [the defendant] were in conformance with the orders of Judge Munro, was it an oversight that 4.4 was included in here?

"[The Witness]: I don't think that the—my testimony or my opinion letter was intended to cite, to go chapter and verse, line by line with every part of every document. Because in any document, any deal, even in this context, ultimately there's going to be give and take and negotiations and things like that; the oversight regarding the no lien other than the lien that the court ordered are going to be picked up. Right?

"So, this is—this was done, you know, a while ago. I think that as a practical matter, you—this would be negotiated, and this would come out. But you have to look at that. So, there's continuum from zero reps and warranties, which is what's being offered up, to something that is more typical and would yield a fair result to [the defendant] being able to sell this business and realize the best value you can and not fire sale it."

[23] There was some discussion during the hearing as to whether certain language contained in the document titled "Promissory Term Note and Security Agreement," on page thirty-eight of the document, required amendment to conform to the promissory note. That language provided: "The obligations under this Note and Security Agreement are not secured by any other assets of Jim Callahan or by any of the assets of any of the Companies . . . ." Ultimately, Perrone agreed that amending the language by "adding the word other before the words assets [of any of the companies] would cure any perceived inconsistency."

[24] The plaintiff further argues that the release contained in exhibit D is not limited to claims relating solely to the companies, but rather releases the defendant from all liability. Although the plaintiff's counsel questioned Perrone as to the release, she failed to raise, either through inquiry of Perrone or the presentation of evidence on her own behalf, a challenge to the scope of the release with respect to the type of claims released. Because the plaintiff failed to raise the scope of the release as an issue before the trial court, we do not address it on appeal. See *Histen* v. *Histen*, 98 Conn. App. 729, 737, 911 A.2d 348 (2006) ("[W]e will not decide an appeal on an issue that was not raised before the trial court. . . . To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." [Internal quotation marks omitted.]).

[25] The court also noted, however, that she had performed work "on one last occasion" in March, 2010.

[26] The plaintiff also asserts in her supplemental brief that "the trial court improperly declined to hold an evidentiary hearing to assess the jurisdictional claim," and states that she sought a hearing "to present testimony regarding, among other things, the homeowner's policy and to clarify mischaracterizations made by counsel during argument." In support of this argument, she cites *Oxford House at Yale* v. *Gilligan*, 125 Conn. App. 464, 473, 10 A.3d 52 (2010), which provides generally that "[i]n almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses. . . . When issues of fact are necessary to the determination of a court's jurisdiction, due process requires that a trial-like hearing be held, in which an opportunity is provided to present evidence and to cross-examine adverse witnesses." (Internal quotation marks omitted.) The defendant responds that the plaintiff waived any claim as to the court's failure to hold an evidentiary hearing. On the basis of our review of the record, we conclude that the plaintiff waived any claim that the court improperly declined to hold an evidentiary hearing.

Addressing the day's schedule at the outset of the hearing on April 3, 2018, the plaintiff's counsel indicated, with respect to her motion for an order, that "we've discussed the fact that should it become—on the Chubb

motion, we're going to argue the legal issues first and then should the court make certain rulings, then we would have a factual hearing, and that would require our witness, who is coming tomorrow."

When the motion came up for argument, counsel for the defendant informed the court that "there really is a preliminary legal issue as to whether this court has the authority to grant the relief being sought in . . . the plaintiff's motion, and that's the issue that we'd like to tee up for Your Honor." Presenting the motion to the court, the plaintiff's counsel stated: "Now, the reason that we're arguing these preliminary matters and, counsel, correct me if I misstate this, is that we do have evidence to put on, but counsel's contention is that the court has no authority to hear this issue, and that is what we're going to argue. And then if the court decides that it wants to hear evidence, we are able to put that on tomorrow."

Toward the conclusion of argument, the plaintiff's counsel argued: "There are factual characterizations and mischaracterizations that would benefit from an evidentiary hearing such as the mischaracterization that [the plaintiff] refused to get new insurance, etc. That if the court deems that the court has . . . statutory authority to hear this issue, does the court in divorce cases construe contracts? Yes. Does the court in divorce cases construe all sorts of wills? You have that jurisdiction and that subject matter jurisdiction and that statutory authority. So, we are seeking an evidentiary hearing so that we can put on our witnesses and Your Honor can make a decision. Counsel is saying Your Honor has no authority to even have a hearing. Thank you."

[27] Paragraph 3 of the May, 2012 dissolution judgment provided: "The plaintiff shall be the sole owner of the real property at 3 Partridge Hollow, Greenwich, Connecticut. The defendant shall within thirty (30) days execute a quitclaim deed provided by the plaintiff to transfer the title. Until such time as the defendant has transferred title to said property, he shall be solely responsible for all costs associated with the property, including but not limited to mortgage, taxes, insurance, all upkeep and repairs in the same condition as the premise[s] were in, or better, than [on the] day the property was appraised by [Michael B.] Gold. The defendant shall vacate the premises with all of his possessions therein on the date of transfer of title. After the defendant has both vacated the premises with all of his belongings and transferred title to the plaintiff, then the plaintiff shall be solely responsible for all of the above referenced costs pertaining to the property and she shall hold the defendant harmless thereon."

[28] See footnote 1 of this opinion.

[29] "A QDRO is the exclusive means by which to assign to a nonemployee spouse all or any portion of pension benefits provided by a plan that is governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq." *Krafick* v. *Krafick*, 234 Conn. 783, 786 n.4, 663 A.2d 365 (1995).